**DUTY FREE AMERICAS, INC., Plaintiff,**

v.

**The ESTÉE LAUDER COMPANIES, INC., Defendant.**

**Case No. 12–60741–Civ.**

United States District Court, S.D. Florida.

May 9, 2013.

Elliot R. Golding, Mark A. Klapow, Crowell & Moring, LLP, Washington, DC, Gabriel Groisman, Coffey Burlington Wright Crockett et al, Armando Rosquete, Paul Joseph Schwiep, Coffey Burlington, Miami, FL, for Plaintiff.

Aaron Stenzler Weiss, Charles Martin Rosenberg, Carlton Fields, Miami, FL, Joseph Kattan, Gibson, Dunn & Crutcher, LLP, Washington, DC, Robert C. Walters, Vinson & Elkins, Dallas, TX, for Defendant.

### ORDER GRANTING MOTION TO DISMISS

ROBERT N. SCOLA, JR., District Judge.

This is primarily an antitrust case. Plaintiff Duty Free Americas, Inc. (DFA) operates duty-free stores in airports and one of the main products it carries is beauty products. Defendant The Estee Lauder Companies, Inc. (ELC) supplies many duty-free stores with its beauty products, but it no longer deals with DFA. DFA alleges that ELC attempted to monopolize the market for beauty products in duty-free stores in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; that ELC conspired with DFA's competitors to (a) exclude DFA from that market, (b) exclude DFA from the market consisting of the bid process by which duty-free operators obtain concessions from airports to operate duty-free stores, and (c) monopolize the beauty-product market in duty-free stores—all in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; and finally, DFA alleges that ELC tortiously interfered with its business relationships with three airports under Florida law. ELC moved to dismiss all these claims for failure to state a valid claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (DE 20.) For the reasons set forth below, the Court **GRANTS** ELC's Motion (DE 20) and **DISMISSES** the claims **without prejudice.**

### BACKGROUND

Most international travelers are familiar with duty-free stores. They are retail outlets located in airports' (and seaports') international terminals, typically offering a distinct assortment of luxury goods—like alcohol, jewelry, and beauty products—to outbound international travelers. "Duty-free" stores get their name from the fact that their customers do not pay certain sales taxes or import duties on purchases in their stores. This gives them a reputation for offering luxury goods at lower prices and on favorable terms. And it is this perception that drives consumer demand.

ELC is the largest manufacturer of beauty products[1] sold in duty-free stores

---

1. DFA's Complaint defines "beauty products" as fragrances and cosmetics (i.e., make up

in U.S. airports; ELC's market share is "approximately 50% or greater." (DE 1 at 2, 29.) Its brands include Aramis, Aveda, Clinique, Donna Karen, Estée Lauder, La Mer, Smashbox, and Tommy Hilfiger. These brands routinely rank first in sales of beauty products in U.S. duty-free stores.

DFA is one of fewer than ten major duty-free store operators in the U.S. It currently operates duty-free stores in JFK, LaGuardia, Detroit, Dulles, Miami, Boston, Baltimore (BWI), Charlotte, Salt Lake City, San Antonio, Phoenix, and Reagan National international airports. DFA is a self-described "maverick" in the duty-free industry, particularly when it comes to its prices, product-displays, and beauty products brands. While most duty-free operators generally offer the same lineup of brands—which includes brands that compete with ELC—DFA also sells new and innovative brands (like Perry Ellis and Jennifer Aniston) that compete with the incumbent brands (like ELC's).

Duty-free operators, such as DFA, generally secure space to operate duty-free stores in a particular airport via a competitive bidding process initiated by a request for proposal (RFP). For example, an airport will generally issue an RFP to operate duty-free stores in its international terminals, typically for a term of five to ten years. Duty-free operators then submit proposals to the airport detailing certain information, such as the products they carry, and the amount of "rent" (typically a percentage of sales) they will pay to the airport in exchange for the duty-free concessions. With some exception, an airport generally awards all of its duty-free concessions to only one duty-free operator.

## A. DFA's factual allegations [2]

Before June 2008, DFA and ELC had a healthy business relationship. ELC would sell its beauty products to DFA at standard "travel retail" wholesale prices—which were lower than traditional retail wholesale prices—and DFA would then add a markup and retail the products in its stores across the U.S. During that time, ELC instructed DFA and its competitors (i.e., other duty-free operators) on what margins to take on the "travel retail" products sold in their stores. It also instructed them on the quality and quantity of display space to be allocated to its beauty products in their duty-free stores. DFA went along with these instructions from ELC.

In January 2007, ELC announced that "effective April 1, 2008[its] Travel Retail Suggested Price ... [would] change to *U.S. Domestic Suggested Retail Price.*" [3] (DE 1–1 at 2.) DFA objected to this price increase, indicating that it would not accept the new wholesale pricing. DFA advised that the increase could diminish the duty-free industry's advantage and reputation for lower pricing on premium beauty products. But ELC encouraged DFA and its competitors to simply maintain their margins by raising prices to consumers.

and skin care). (DE 1 at 2.)

**2.** These facts are derived from the well-pled factual allegations in the Complaint, which must be taken as true and construed in the light most favorable to DFA. *See World Holdings, LLC v. Federal Republic of Germany*, 701 F.3d 641, 649 (11th Cir.2012).

**3.** Since this is a *suggested* retail price, the reasonable inference is that the letter is in-

forming the duty-free operators of the price at which ELC suggests the products should be sold to consumers. If the letter instead referred to the prices ELC would charge DFA, then it would not be a labeled a suggestion. Moreover, the letter uses different wording than the Complaint in describing this announcement. The Complaint consistently describes the prices that duty free stores pay manufacturers like ELC as travel retail wholesale pricing. (*See* DE 1 at 2–3, 6.)

DFA refused and stopped buying ELC's beauty products.

When DFA later learned that ELC had not raised its products price, DFA tried to resume purchasing ELC's beauty products. But this time ELC refused DFA's requests. So DFA began devoting the display space it had previously used for ELC's brands to introduce new beauty product brands in its duty-free stores, many of which had not been sold before in U.S. duty-free stores. For example, DFA introduced and developed a significant demand for a new beauty product brand—Smashbox. In 2010, however, ELC acquired Smashbox after obtaining antitrust regulatory approval for the deal. It then ceased supplying Smashbox to DFA. DFA has tried to negotiate future sales of Smashbox, but to no avail.

### 1. The Newark RFP

In December 2008, an RFP was issued to lease and develop duty-free concessions at Newark Liberty International Airport (Newark airport) for a new seven-year term. DFA and rival duty-free operators submitted bids. About three weeks later—before the identities of the bidders were made public—ELC's President of Travel Retailing Worldwide, Olivier Bottrie, sent an unsolicited letter to Ms. Judy Tuttle, the leasing agent who managed the RFP process for Newark and other airports. The letter highlighted and promoted ELC's authorized duty-free retail partners:

Dear Ms. Tuttle:

In the context of a tough economy and fears of a prolonged recession, suppliers depend on, and need to rely on, the quality of their authorized retailer partners.

The Estée Lauder Companies are proud to have established strong and mutually beneficial commercial relationships with, and only with, the following landed retail partners in the United States of Americas:

— Alpha Keys

— Ammex

— DFASS

— DFASS–Nuance

— DFS Group

— DUFRY

— EJE

— HMS–Host

— International Shoppes

— Nuance

We are confident that each of these authorized retailers brings the expected quality of in-store execution and required operational excellence necessary to represent our brands and service your valued passengers.

Sincerely,

[Signed, Olivier Bottrie]

(DE 1–2 at 2.) DFA's bid was ultimately rejected.

### 2. The Boston RFP

Two and a half years later, in May 2011, an RFP was issued to lease and develop duty-free concessions at Boston Logan International Airport (Boston airport) for a new seven-year term. At that time, DFA had been the incumbent at Boston for the prior 16 years and had doubled sales during its tenure. DFA submitted a bid, along with two of its competitors: International Shoppes and Dufry. During the RFP process, ELC and its alleged co-conspirators—"such as DFASS, Nuance, International Shoppes, and Travel Retail," (*see id.* at 23)—communicated with the decisionmakers in a manner similar to the letter ELC had sent during the Newark RFP. The decisionmakers responded by asking DFA about its ability to carry ELC's products. DFA's bid was ultimately rejected and one of its competitors was awarded the duty-free concessions.

### 3. The Orlando RFP

Around the same time in mid–2011, an RFP was issued to lease and develop duty-free retail concessions at Orlando International Airport (Orlando airport). But this time DFA partnered with Stellar, a local company that operated duty-free stores at Tampa International Airport (Tampa), to submit a joint bid for the duty-free concessions at the Orlando airport. At that time, ELC was not selling its products to either DFA or Stellar. But for several years prior, ELC had sold its beauty products directly to Stellar and, later, indirectly through other wholesalers. ELC had also represented that it would resume selling to Stellar in two situations: if international enplanements increased to a certain level at Tampa, resulting in a larger duty-free store, or if Stellar were to be awarded the duty-free concession at a larger airport. Based on this representation, DFA and Stellar listed ELC's brands in their joint proposal for the Orlando duty-free concession. Two competing bidders—Nuance/DFASS or Travel Retail—informed ELC that DFA and Stellar were bidding on the concession.

Upon learning that the joint bid listed its brands, ELC and its alleged co-conspirators informed the Orlando decisionmakers (1) that ELC would not sell its products to DFA or Stellar; (2) that supply of its products was necessary for the duty-free store to succeed; and (3) that, consequently, awarding the concessions to DFA and Stellar would diminish duty-free sales in Orlando. ELC subsequently memorialized its refusals to deal in a letter to the Orlando decisionmakers, who ultimately rejected DFA and Stellar's joint bid. The decisionmakers instead provisionally awarded the concessions to Nuance/DFASS. When DFA appealed, it was informed that its inability to supply ELC's products was *a* central reason its joint bid had been rejected. (*Id.* at 11 (emphasis added).)

### 4. The Atlanta RFP

In July 2011, an RFP was issued to lease and redevelop duty-free retail concession at the Hartsfield–Jackson Atlanta International Airport ("Atlanta") for a seven-year term, with an option for a three-year renewal. The RFP was designed as a sealed RFP, meaning that the identities of the potential bidders would not be known until bids were submitted. DFA and three of its competitors (including Nuance) responded to the RFP before the October 1, 2011 deadline. On November 1, 2011, Adam Smith, the Chief Procurement Officer, notified the bidders that a recommendation of award would be made to DFA.

Seven weeks later, on December 22, 2011, Mr. Smith notified DFA that he had recently received information regarding DFA's participation in the Orlando RFP. He noted that, while DFA's proposal had identified 19 SKUs of ELC's products, he had been advised that DFA could not carry ELC's products. DFA confirmed that it could carry the products listed because DFA still had these 19 SKUs in its outstanding inventory. Shortly thereafter, the Atlanta City Council passed a resolution awarding the duty-free concessions to DFA.

Nuance subsequently sent a letter protesting the award to DFA, accusing DFA of intentionally making material representations during the RFP process. Nuance further attempted to persuade the decisionmakers that carrying ELC's full line of products was essential for the success of its duty-free store. Despite this letter, DFA retained the duty-free concessions.

## ANALYSIS

### A. Motion-to-dismiss standard

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of the Complaint's well-pled factual allegations as true and construe them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir.2008). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (brackets, internal citation, and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* So a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will be dismissed. *Id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal* to a motion to dismiss, the Eleventh Circuit has instructed that

> a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 Fed.Appx. 136, 138 (11th Cir.2011) (brackets, internal citations, and quotation marks omitted). The plausibility standard of *Twombly* and *Iqbal* "applies to all civil actions." *Id.*

### B. DFA's conspiracy claims under § 1 of the Sherman Act

 Counts 1 and 2 assert antitrust conspiracy claims under the Sherman Act, 15 U.S.C. §§ 1, 2. In Count 1, DFA claims that ELC conspired with DFA's competitors in the duty-free business—DFASS, Nuance, International Shoppes, and Travel Retail—to unreasonably restrain trade in violation of Section 1. In Count 2, DFA claims that ELC further conspired to monopolize the market for selling beauty products in U.S. airport duty-free stores in violation of Section 2.[4] Both § 1 and § 2 conspiracy claims "require the same threshold showing—the existence of an agreement to restrain trade."[5] *Todorov v.*

---

4. Altogether, DFA alleges four conspiracy theories: (1) to exclude DFA from the market of bidding on duty-free concessions at U.S. airports; (2) to exclude DFA from the market of selling beauty products in U.S. airport duty-free stores; (3) to raise the prices of beauty products sold in U.S. airport duty-free stores; and (4) to monopolize the market for beauty products sold in U.S. airport duty-free stores.

5. Both claims require additional elements as well. For instance, to state a claim for conspiracy to restrain trade under § 1, a plaintiff

must allege facts plausibly suggesting "(1) an agreement to enter a conspiracy, (2) designed to achieve an unlawful objective." *Aquatherm Industries, Inc. v. Florida Power & Light Co.,* 145 F.3d 1258, 1262 (11th Cir.1998). To state a claim for conspiracy to monopolize under § 2, a plaintiff must allege facts plausibly suggesting "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of

*DCH Healthcare Authority,* 921 F.2d 1438, 1460, n. 35 (11th Cir.1991). Indeed, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly,* 550 U.S. at 553, 127 S.Ct. 1955 (citation omitted).

To cross this threshold at the pleading stage, a complaint must contain enough factual matter to plausibly suggest an agreement was made. *See id.* at 556, 127 S.Ct. 1955. But this "does not impose a probability requirement ...; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* But allegations of parallel conduct coupled with bare assertions of conspiracy will not suffice. *See id.* More is required: "allegations of parallel conduct ... must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 556–57, 127 S.Ct. 1955; *see also Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,* 709 F.3d 129, 137–38 (2d Cir.2013) (affirming dismissal of antitrust conspiracy claim because plaintiffs "essentially pleaded only parallel conduct," and the "few additional facts they do assert fail plausibly to suggest that this parallel conduct flowed from a preceding agreement rather than from their own business priorities"); *Loren Data Corp. v. GXS, Inc.,* 501 Fed.Appx. 275, 281 (4th Cir.2012) (concluding that

allegations did not plausibly suggest a concerted refusal to deal because they contradicted any inference of conspiracy and instead showed defendant's unilateral business judgment as to "the parameters under which it was willing to deal with [plaintiff], an entity it viewed as having an incompatible business model"); *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 227 (3d Cir.2011) (concluding that allegations that various creditors exchanged information about plaintiff's credit-worthiness during twenty-seven separate telephone calls were insufficient to state a plausible conspiracy to fix prices and boycott the plaintiff, because the alleged conduct was equally consistent with each defendant's self-interest in protecting itself from a defaulting debtor and no evidence of "traditional conspiracy," such as suspect meetings or group discussions was alleged).

Here, ELC argues that DFA has failed to allege enough facts to plausibly suggest any "agreement" between ELC and DFA's competitors. It contends that the only fact DFA has alleged that could even begin to support an inference of an agreement is the December 23, 2008 letter ELC sent to Newark's leasing agent. DFA responds, however, that the following circumstantial allegations are enough to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement:

(1) ELC submitted an unsolicited letter to the Newark RFP decisionmakers before the identity of the bidders was made public (DE 1 at 8); [6]

---

the conspiracy." *Todorov,* 921 F.2d at 1460, n. 35.

**6.** DFA argues in its brief that this allegation means that the "Newark airport bid process was sealed from the public, and thus no one except bidders knew about it." (DE 25 at 5 (citing DE 1 at 8).) But the allegation does not support that interpretation. Just because the identities of the bidders had not yet been revealed does not mean that no one knew

about the process except the bidders. DFA's interpretation of its complaint during the hearing was more reasonable: DFA responded to the Court's questions by admitting that it was not a secret that the Newark airport was accepting bids on its duty-free concessions. (DE 114 at 26.) DFA further admitted that people in the cosmetic industry and the duty-free retail business—a description that encompasses ELC—would presumably know about the bid process. (*Id.*)

(2) ELC improperly interfered in the sealed RFP process in which it was not a bidder by sending an unsolicited letter identifying its authorized duty-free retailers, (*id.*); [7]

(3) because the Newark RFP process was closed, "the only plausible explanation for how ELC could have known that DFA bid" is that ELC must have conspired with one of DFA's competitors, (*id.*);

(4) the effect of ELC's interference was to eliminate DFA from consideration, (*id.* at 8–9);

(5) ELC and/or DFA's competitors also interfered in RFP processes in Atlanta, Boston and Orlando by making similar communications to the relevant decisionmakers, (*id.* at 9, 11–12); and

(6) ELC had the opportunity to conspire because it maintains business partnerships with DFASS and Heinemann Group, two of DFA's competitors, (*id.* at 20).

Though ELC alleges the closed-bid process used by Newark means that the only plausible way ELC could have known that DFA bid is to conspire with a DFA competitor, that is not the only explanation, and it is not the most plausible one. *See Kivisto*, 413 Fed.Appx. at 138 (holding that a court may infer from facts alleged in a complaint obvious alternative explanations

that suggest "lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer"). As DFA admitted at oral argument, it was not a secret that the Newark airport was accepting bids on its duty-free concessions. (DE 114 at 26.) DFA further admitted that people in the cosmetic industry and the duty-free retail business—a description that encompasses ELC—would presumably know about the bid process. (*Id.*) These interpretations are reasonable based on the Complaint. And given these reasonable inferences, a more plausible explanation for ELC's decision to submit the unsolicited letter to the Newark RFP decisionmakers was to try to ensure that one of the duty-free operators ELC had a relationship would win the bid. ELC could reasonably assume that at least one duty-free operator that sold its products would submit a bid, and ELC would therefore naturally want to promote all the operators that sold its products to maximize the chance that the winner bidder would be an operator who could sell those products. The reasonableness of this interpretation is further bolstered by the content of ELC's letter: the letter merely conveys which duty-free operators are authorized to sell ELC's products and then promotes these operators by conveying ELC's unsurprising opinion that the operators it has chosen to associate itself with are quality operators. (DE 1–2 at 2.) And since the cost to ELC of writing a short,

---

**7.** DFA alleged that only the Newark and Atlanta RFPs were "sealed," meaning that the identities of bidders were not known. (*See* DE 1 at 8, 12.) But DFA does not allege that no one besides the bidders knew that the Newark and Atlanta airports were accepting bids on their duty-free concessions. While the Court accepts as true the factual allegation that ELC's letter was unsolicited, the further allegation that the letter was improper is a legal conclusion the Court need not credit. DFA has not alleged that rules prohibited other entities from contacting the decisionmakers to inform them who they thought

would be good duty-free operators. Moreover, since DFA has alleged that there are fewer than 10 major duty-free operators (*id.* at 14), and since ELC's letter shows that it had a relationship with 10 duty-free operators in December 2008, it would have been reasonable for ELC to assume that at least one of the duty-free operators bidding during these RFPs was authorized to sell its products, which in turn would make it in ELC's interest to submit a letter identifying all the operators it had a relationship with to increase the chance the winning bid would sell ELC products.

factual letter is small, but the benefit from having the winning bidder being able to sell its products is very large in comparison, one could reasonably assume that deciding to write the letter would be an easy business decision. This chain of reasonable inferences eviscerates DFA's contention that ELC and one or more of DFA's competitors conspired to have ELC write the letter.

But even if the Court were to accept DFA's argument that a conspiracy is the only plausible explanation for the letter (it is most certainly not), DFA still has not plausibly alleged a conspiracy. Even this proffered explanation combined with the further, more reasonable allegation that ELC's letter may have caused Newark to reject DFA's bid is not enough. Without more factual meat on the bones of the skeletal Complaint, it is not reasonable to infer that ELC and DFA's competitors agreed to anything at all, much less a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *see also City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 569 (11th Cir.1999) (explaining that "a plaintiff must demonstrate a 'unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement'") (citations omitted).

DFA tries to persuade the Court otherwise by citing to numerous cases. But only *In re Delta/AirTran Baggage Fee Antitrust Litigation*, 733 F.Supp.2d 1348 (N.D.Ga.2010) and *In re Packaged Ice Antitrust Litigation*, 723 F.Supp.2d 987 (E.D.Mich.2010) involved motions to dismiss antitrust conspiracy claims under *Twombly's* plausibility standard. And neither lends support to DFA's contention that it has alleged a plausible conspiracy here.

In *In re Delta*, the district court declined to dismiss a § 1 claim brought by airline passengers against Delta and AirTran, two fierce rivals in the Atlanta airline market. The plaintiffs alleged that the rival airliners had conspired to raise prices by, among other things, imposing first-bag fees. According to the complaint, AirTran first invited Delta to collude during a public earnings call. That invitation sparked a roughly six-month public dialogue between the airliners about their respective plans to increase prices, and their expectations as to what the other needed to do to increase prices. In describing the ongoing public dialogue leading up to the alleged conspiracy, the complaint laid out specific allegations about how the airliners communicated with each other (via a series of earnings calls and industry conferences), when they did so, who was involved in the communications, and what was communicated.[8] The complaint further described how the airliners

---

**8.** For example, following AirTran's initial invitation to Delta to collude, Delta indicated during a public earnings call that it had no plans to implement a first-bag fee. Thirteen days later, during AirTran's public earnings call (which it knew Delta monitored), AirTran stated that it was considering the viability of implementing first-bag fees. Roughly two and a half months later, Delta indicated during another public earnings call (which it knew AirTran monitored) that it was willing to impose first-bag fees. Eight days later,

AirTran remarked during its public earnings call that it wanted to implement first-bag fees and had invested in the capability to do so, but that it had not yet implemented the fee because Delta had not done so. Less than two weeks later, Delta announced that it was implementing a $15 first-bag fee, effective December 5, 2008. One week later, AirTran announced that it was implementing the exact same fee on the exact same day. *See In re Delta*, 733 F.Supp.2d at 1352–56.

subsequently aligned their business practices following their collusive communications by implementing the exact same first-bag fee on the exact same date, and at a time when it was contrary to their self-interest to do so alone. At bottom, it was "[t]hese changed business practices—combined with the preceding communications—[that] support[ed] a plausible inference of a conspiracy to restrain trade." *In re Delta*, 733 F.Supp.2d at 1361.

Similarly, the district court in *In re Packaged Ice* also declined to dismiss an antitrust conspiracy claim because the complaint's specific allegations as to who, what, where, and when gave the defendant sufficient notice of the plaintiffs' claims and the grounds upon which they rested. There, retail stores and gas stations brought a § 1 claim against three of the largest U.S. manufacturers and distributers of packaged ice. The nub of the plaintiffs' complaint was that the defendants had "conspired among themselves to allocate markets and customers and agreed not to compete with each other, the effect of which ha[d] been to fix, raise, maintain or stabilize prices paid by direct purchasers" of packaged ice. *In re Packaged Ice*, 723 F.Supp.2d at 1003. As support for their conspiracy claim, the plaintiffs alleged a laundry list of facts including: that some of the defendants had pled guilty to criminal antitrust violations; that key executives had been suspended for violating corporate policy regarding antitrust compliance; that company insiders had admitted to nationwide collusion, as well as the substance of those admissions; that other former employees were expected to testify in support of the insider's admissions; that state attorneys general had investigated claims of anticompetitive conduct in the packaged ice industry; that the defendants had taken actions against their economic self-interest; that price increases were not explained by increased costs; that the mar-

ket structure was conducive to collusion; and that the defendants had specific opportunities, through identified meetings, to conspire. *See id.* Based on these allegations, the court found that the defendants had sufficient notice as to:

> who (the corporate players [were] clearly identified along with the names of several of their key high-level executives), what (agreements to stay out of each other's territories, the details of which [were] alleged to be known by specific named individuals as well as by certain sufficiently identified confidential witnesses, and which [were] the subject of several ongoing government investigations and criminal guilty pleas), where (Cincinnati, Southeastern Michigan and other specifically referenced locations) and when (the time frames [were] identified in the [complaint] and [were] well known based on the plea agreements and the various ongoing criminal investigations).

*Id.* at 1007. The district court thus concluded that the complaint raised a reasonable expectation that discovery would reveal evidence of an illegal agreement. *See id.* at 1017; *cf. Kendall v. Visa U.S.A.*, 518 F.3d 1042, 1048 (9th Cir.2008) (dismissing antitrust conspiracy claim because "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?").

■ DFA's Complaint here, on the other hand, pales in comparison to the two post-*Twombly* cases on which it relies. Unlike *In re Delta* where the plaintiffs alleged a litany of collusive communications leading to the conspiratorial agreement, DFA has not alleged any collusive communications between ELC and its co-conspirators here. Nor has DFA articulated enough facts to give sufficient notice as to the "who," "what," "where," or "when" of its conspiracy theories, like in *In re Packaged Ice.* For instance, as to

"who" are ELC's alleged co-conspirators, DFA identifies "DFASS, Nuance, International Shoppes, and Travel Retail." (DE 1 at 23.) But nowhere in the Complaint does DFA allege who at ELC may have communicated, let alone colluded, with whom at DFASS, Nuance, International Shoppes, or Travel Retail. The Complaint is also silent as to "where" or "what" these unidentified persons communicated, if at all. As for "when", DFA merely speculates "[u]pon information and belief, [that] ELC and its co-conspirators initiated the conspiracy soon after DFA opposed ELC's plan to increase duty free prices." (*Id.* at 21.) But such "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," no matter how many times it is echoed in the Complaint. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955; (*see also* DE 1 at 8, 21, 24, 26.)

When shorn of its conclusory allegations, DFA's Complaint reveals allegations of parallel business conduct with little more. Central to DFA's conspiracy claims is that ELC and its alleged co-conspirators engaged in a concerted "smear campaign" against DFA by "improperly and maliciously" interfering with the RFP processes by "making defamatory statements to various U.S. airport authorities." (*Id.* at 20.) As evidence of their modus operandi, DFA points to the letter that ELC sent to Newark's leasing agent. (*See* DE 1–2 at 2.) But that letter does not provide any indication that ELC and DFA's competitors agreed to engage in any kind of concerted action against DFA. The letter does not even mention DFA. Nor does it otherwise imply "by negative inference," as DFA contends, that it is "not a 'quality' duty free operator." (DE 1 at 8.) At most,

the letter merely suggests that ELC had an interest in seeing that one of its authorized duty-free retailers (as opposed to a retailer with whom it does not deal, like DFA) was awarded Newark's duty-free concessions.

Moreover, the fact that the purported "smear campaign" continued during other airports' RFP processes does not make DFA's conspiracy theory anything more than a scant possibility. For instance, with respect to the RFP at Boston, DFA alleged that, "on information and belief, ELC and/or its co-conspirators made a communication to relevant decisionmakers that was similar to the unsolicited letter that ELC had sent during the Newark bid." (*Id.* at 9.) As to the RFP at Orlando, DFA alleged that "ELC and its co-conspirators told relevant Orlando decisionmakers (1) that ELC would not sell to DFA or [its partner,] Stellar, (2) that supply of ELC products is necessary for a duty free store to succeed, and (3) that, consequently, selecting DFA would diminish duty free sales levels in Orlando." (*Id.* at 11.) DFA further alleged that ELC and its co-conspirators made similar communications to the decisionmakers during the RFP at Atlanta.[9] (*See id.* at 12.) Taking all of these allegations as true and construing them in the light most favorable to DFA, they still amount to nothing more than allegations of parallel business conduct.

But DFA "'cannot state an antitrust claim by merely showing parallel conduct and from it divine that an agreement must be the source from which the parallel conduct arose.'" *In re Delta*, 733 F.Supp.2d at 1359. More is required—such allegations "must be placed in a context that raises a suggestion of a preceding agreement."[10] *Twombly*, 550 U.S. at 556–57,

9. Note that despite these alleged communications, DFA was still awarded Atlanta's duty-free concessions.

10. To the extent DFA argues that it has shown that something "more" by alleging that ELC and DFA's competitors had the opportunity to conspire because ELC maintains partnerships

127 S.Ct. 1955. As the Eleventh Circuit has explained, DFA "had the burden to present allegations showing why it is more plausible that [ELC] and [DFA's competitors]—assuming they are rational actors acting in their economic self-interest—would enter into an illegal ... agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior." *Jacobs v. Tempur–Pedic International, Inc.,* 626 F.3d 1327, 1342 (11th Cir.2010); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596–97, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[I]f [the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."). DFA, however, has failed to meet this burden.

Both ELC and DFA's competitors have sufficient independent economic incentives to communicate with the airports' decisionmakers without the need to conspire with anyone. ELC's incentive to promote its authorized duty-free retailers to the airport's decisionmakers is obvious—to increase the likelihood that its beauty products are sold in a particular airport. DFA's competitors also have a similar independent economic incentive—to increase their chances of winning a particular RFP process by distinguishing themselves from their competition. And even if it was "improper" for ELC and DFA's competitors to have done so during some of the RFPs—a conclusory allegation not supported by facts—"without that further circumstance pointing towards a meeting of the minds [between ELC and DFA's competitors], an account of a defendant's commercial efforts stays in neutral territory." *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955.

In sum, because ELC's alleged conduct is "not only compatible with, but indeed is more likely explained by, lawful, unchoreographed free-market behavior," *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937, there is no reasonable expectation that discovery will reveal evidence of illegal agreement. *See Twombly,* 550 U.S. at 556, 127 S.Ct. 1955; *see also Tempur–Pedic,* 626 F.3d at 1342–43 (upholding dismissal of antitrust conspiracy claim because plaintiffs failed to allege facts suggestive enough to render conspiracy plausible, given alleged conduct was as consistent with independent economic activity as it was with conspiracy); *Credit Bureau Services, Inc. v. Experian Information Solutions, Inc.,* No. 12–61360–CIV, 2012 WL 6102068, at *20 (S.D.Fla. Dec. 7, 2012) (dismissing antitrust conspiracy claims because plaintiff "set forth factual contentions that are at least just as plausibly explained by competition as they are by conspiracy"). For these reasons, the Court should conclude that DFA has failed to allege enough facts to plausibly suggest an "agreement" between ELC and DFA's competitors. Counts I and II should be dismissed.

### C. *DFA's attempted-monopolization claim under § 2*

The next issue is whether DFA has stated a valid claim that ELC violated § 2 of the Sherman Act by attempting to monopolize the relevant markets, which DFA defines as either cosmetics sold in duty-free stores in U.S. airports or skincare products sold in those same stores.

---

with DFASS (one of DFA's competitors) and Heinemann Group (which operates another of DFA's competitors, Travel Retail), "the mere opportunity to conspire ... does not, standing alone, permit the inference of conspiracy." *Williamson Oil Co., Inc. v. Philip Morris,* 346

F.3d 1287, 1319 (11th Cir.2003) (citation omitted). Nor does it suffice when coupled with allegations of parallel business behavior. *See Twombly,* 550 U.S. at 567, n. 12, 127 S.Ct. 1955.

An attempted-monopolization claim under § 2 requires that a plaintiff prove (1) that the defendant specifically intended to monopolize, (2) that the defendant engaged in predatory or anticompetitive conduct to achieve that intent, and (3) that there was a dangerous probability the defendant would succeed in achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). *Monopoly power,* which is synonymous with *market power,* is "the power to raise prices to supracompetitive levels or the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 994 (11th Cir.1993) (ellipses and internal quotation marks omitted). ELC argues that DFA does not plausibly allege the second or third element, and that DFA fails to define a proper relevant market, as it must. Because the Court finds DFA's allegations regarding the second element wanting, the analysis ends there.

▮▮▮ The first anticompetitive conduct DFA alleges is ELC's refusing to deal with DFA and its business partner during the Orlando RFP, Stellar. But the fundamental flaw with this argument is that ELC has the right to choose whom it deals with: "as a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Communications Inc. v. Law Offices*

*of Curtis V. Trinko, LLP,* 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) ("*Trinko*") (brackets and internal quotation marks omitted). Though an exception to this rule exists, the exception is "is at or near the outer boundary of § 2 liability" and thus is narrow: at a minimum, it applies only when a defendant with monopoly power unilaterally terminates voluntary business dealings with a competitor in circumstances strongly suggesting that the termination was designed to achieve an anticompetitive end. *Id.* at 408–410, 124 S.Ct. 872. DFA does not allege that it competes with ELC, that ELC has monopoly power,[11] or that ELC terminated a relationship with Stellar where it sold products directly to Stellar.[12] In addition, the allegations concerning the termination of DFA and ELC's business relationship is at best ambiguous as to who terminated the relationship; the more plausible interpretation is that DFA did. (*See* DE 1 at 3–4.) So DFA's allegations do not establish that ELC engaged in anticompetitive conduct when it refused to deal with DFA. *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.,* 763 F.Supp.2d 1341, 1350 (S.D.Fla.2011) (Huck, J.) ("Generally, a monopolist has no duty to assist its (potential) rival by dealing with it or providing it access to the monopolist's facility, especially where that rival can reasonably develop, on its own, the resource it seeks from the monopolist.").

▮▮▮ DFA next alleges that ELC engaged in anticompetitive conduct by falsely disparaging DFA to airport authorities. But false statements constitute anticom-

---

11. "A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power." *Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1250 (11th Cir.2002). DFA alleges that ELC's market share in the relevant market is "approximately 50% or greater." (DE 1 at 29.)

12. The Complaint makes it clear that ELC had stopped directly selling products to Stellar before Stellar and DFA partnered for the Orlando RFP. (DE 1 at 10.) So ELC's later pronouncement that it would refuse to sell its products to Stellar did not constitute a change in its current relationship with Stellar. (DE 1 at 11.)

petitive conduct only if those statements "overcome a presumption that [their] effect on competition … was de minimis." *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir.1997). To do so requires showing that the statements were "[1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals. *Id.* (brackets in original) (internal quotation marks omitted). But DFA has not alleged facts satisfying this test. Nor could it: the ELC letter attached to the Complaint contains only *truthful* statements. (*See* DE 1–2 at 2.) So ELC's alleged disparaging comments about DFA do not constitute anticompetitive conduct.[13]

▮▮▮▮ DFA next relies on allegations that ELC set prices. Although DFA alleges in one portion of its complaint that "ELC … set prices to consumers at the … retail level" by instructing duty-free operators on what margins to take on products ELC sold them, DFA undercuts this allegation by alleging that ELC "*encouraged* DFA (and presumably other duty-free store operators) to maintain margins" and thus raise prices to consum-

ers after ELC announced its intent to increase the prices at which it sold products to duty-free operators. (*See* DE 3 (emphasis added).)[14] Encouraging duty-free operators to maintain margins is not the same as setting retail prices. Moreover, DFA alleges that this attempt to raise prices did not work. (*Id.*) And the letter DFA attaches to the Complaint undercuts its allegations that ELC announced its intent to raise the price at which it sold products to duty-free operators: that letter instead unambiguously states the ELC is raising the "Travel *Retail* Suggested Price." (DE 1–1 at 2 (emphasis added).) This does not violate antitrust law: announcing a "resale price[ ] in advance and refus[ing] to deal with those who fail to comply" is not an antitrust violation. *Monsanto*, 465 U.S. at 761, 104 S.Ct. 1464. There must be concerted action: in other words, the manufacturer must agree with someone down the supply chain to raise prices. *Id.* at 760–61, 104 S.Ct. 2091. DFA has not alleged this and the letter does not support this. So the price allegations do not plausibly allege anticompetitive price fixing.

▮▮▮ DFA next turns to its allegations that ELC required duty-free operators to provide ELC products with a "disproportionate amount of display place to increase market share and prevent allocation of

---

**13.** DFA's reliance on *Redbox Automated Retail LLC v. Universal City Studios, LLLP*, 2009 WL 2588748 (D.Del. Aug. 17, 2009), is misplaced. *Redbox* denied a motion to dismiss an antitrust claim because Redbox alleged that the Universal persuaded others to *boycott* Redbox by not distributing Universal DVDs to it. *Id.* at *5. Taking action to bring about a boycott is a far cry from ELC sending letters containing truthful statements that promote ELC's business partners. DFA never alleges that any airport boycotted it; rather, DFA simply alleges that some airports decided to award duty-free concessions to other businesses after ELC communicated truthful information to the airports.

**14.** In its Complaint, DFA alleges that the fact that other duty-free operators went along with ELC's pronouncements regarding retail prices and display requirements shows an illegal conspiracy between ELC and these operators. (DE 1 at 19.) But DFA alleged in its Complaint that while it had an ongoing relationship with ELC it too went along with these pronouncements regarding price and display requirements. (*Id.* at 7.) And at oral argument, DFA admitted that going along with these pronouncements was not evidence that it was involved in an illegal conspiracy. (DE 114 at 33–37.) That other operators now are going along with similar pronouncements is thus also not such evidence. (*Id.* at 36–37.)

space to competing brands." (DE 1 at 7.) While display space being disproportionate to sales is relevant to determining if a complaint sufficiently alleges anticompetitive conduct, it is not sufficient; the disproportionate display space must "substantially foreclose[ ] competition in the relevant market." *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, 2011 WL 1225912, at *10–14 (N.D.Cal. April 1, 2011). In *Church*, Mayer's counterclaims adequately pled the substantial-foreclosure element by alleging the following:

> (1) the market and monopoly power of C & D (whose sales account for over 75% of retail condom sales in the United States); (2) the uniquely important role in marketing played by in-store displays for condoms (and the relative lack of other non-retail means of reaching the consumer); (3) the concentration of ownership at the retail level and the high degree of penetration obtained by C & D through its Planogram Program; (4) the fact that under the Planogram Program, there are hierarchies of rebates that incentivize retailers to award display space to C & D disproportionate to its market share; (5) the fact that under the Planogram Program, because it stipulates a minimum percentage of display space be devoted to C & D (as opposed to e.g., minimum lineal footage of display), the residual space available to competitors is limited—retailers under the program cannot add space for Mayer without increasing C & D's space by a multitude, and thus the likelihood of displacement is greater; (6) in fact, Mayer's products have actually been displaced under the Planogram Program by C & D products even where relative sales did not warrant it; (7) the fact that C & D has successfully ratcheted up its Planogram Program, raising the percentage of display space guaranteed for its products; (8) that there are significant barriers to entry into this market;

> (9) that C & D has successfully raised prices for the products; and (10) that while C & D's market share has gone up, Mayer's market share has declined

*Id.* at 14. DFA's allegations, in contrast, are less specific, more conclusory, and therefore insufficient under *Twombly* and *Iqbal.*

Moreover, several allegations in the Complaint undercut the plausibility that ELC's alleged disproportionate display space substantially forecloses competition in the relevant market; in other words, these allegations suggest a functioning competitive market rather than a stifled one. For example, DFA alleges that it promoted and sold Smashbox when it was independent and "develop[ed] significant demand for that brand"; that after DFA and ELC parted ways, DFA "introduce[d] and develop[ed] even more brands, many of which had not previously been introduced into duty free stores in U.S. airports"; and that "DFA currently operates airport duty free stores in JFK, LaGuardia, Detroit, Dulles, Miami, Boston, Baltimore (BWI), Charlotte, Salt Lake City, San Antonio, Phoenix, and Reagan National". (DE 1 at 4–5, 18.) Even DFA's competitors offer multiple brands that compete with ELC. (*Id.* at 15.) And, as ELC notes, "DFA's allegation that 'there has been *relatively little* recent change at the top in the major manufacturers of beauty products ... sold in duty free stores' suggests that there has been *some* recent change at the top of this alleged market and that even more changes may have occurred below the very top tier of competition." (DE 20 at 20 (quoting DE 1 at 14) (emphasis in original).) In sum, these allegations suggest that new products can successfully enter the market and that there is upward mobility, and this undercuts the plausibility that competition in the market is substantially foreclosed.

Because DFA fails to show that ELC engaged in anticompetitive conduct, DFA's attempted monopolization claims fails.[15]

### D. *Tortious interference with a business relationship*

■ The final issue is whether DFA has stated a valid claim for tortious interference with a business relationship under Florida law. DFA argues that ELC tortiously interfered with DFA's prospective business relationships with the Newark, Boston, and Orlando Airport Authorities by taking actions that prevented DFA from securing duty-free concessions from these airports. (DE 26 at 16.) To prevail on a tortious-interference claim, the plaintiff must prove "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla.1994) (ellipses omitted). Because DFA's Complaint fails to plausibly allege that a business relationship existed between it and the Newark, Boston, and Orlando airports, the tortious-interference claim is dismissed. Although it seems unlikely DFA will be able to sufficiently plead the existence of a protected business relationship, the court will give it the opportunity to do so. Count 4 is therefore dismissed without prejudice.

■ Though "a protected business relationship need not be evidenced by an enforceable contract," such a relationship requires evidence of "an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* at 814–15. So a "mere offer to sell" is not enough to support a tortious-interference claim. *Id.* at 814 (quoting *Landry v. Hornstein,* 462 So.2d 844, 846 (Fla. 3d DCA 1985)). And absent an identifiable agreement between a past customer and a plaintiff that the past customer would do business with the plaintiff again, a plaintiff's past relationship with a past customer cannot be the basis for the existence of a business relationship. *Id.* at 815; *Medical Savings Insurance Co. v. HCA, Inc.*, 2005 WL 1528666, at *9 (M.D.Fla. June 24, 2005), *aff'd,* 186 Fed.Appx. 919 (11th Cir. 2006).

■ Similarly, a bidder generally cannot establish a protected business relationship with an entity soliciting bids through a competitive bidding process. *See Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC,* 845 F.Supp.2d 1241, 1258–59 (M.D.Fla.2012) (holding that the plaintiff's tortious-interference claim failed because the United States military's solicitation for bids, also known as a "request for bid" or "request for proposal," did not establish a protected business relationship between the military and the plaintiff bidder). This is so for two principal reasons. A solicitation for bids, such as an RFP, is *not* a contract, but merely a request for offers from interested parties. *Id.; Hoon v. Pate Construction Co., Inc.,* 607 So.2d 423, 426 (1992). And since a solicitation for bids encourages parties besides a plain-

---

15. DFA's remaining allegations of anticompetitive conduct merit little attention. Though DFA alleges that ELC has purchased competing brands that had been sold at duty-free stores by only DFA, like Smashbox, DFA alleges that ELC did this to diminish competition in the beauty-product manufacturing market, which is neither a market it defines nor a relevant market for purposes of DFA's attempted-monopolization claim. (*See* DE 1 at 28.) Since the Court has rejected DFA's allegations of conspiracy, they cannot form the basis of anticompetitive conduct. The same result holds for DFA's allegations that anticompetitive conduct is demonstrated by ELC's tortious activity because the Court rejects the only tort claim DFA alleges below.

tiff bidder to submit offers in response, the bidding process itself cannot serve as evidence that the solicitor probably would have entered into a contract with the plaintiff but for the defendant's interference. *Mobile Shelter*, 845 F.Supp.2d at 1259.

So to establish a protected business relationship within a bidding process, a plaintiff must allege additional facts indicating that the relationship went beyond the bidding process and into negotiations which in all probability would have been completed. *See id.; Walters v. Blankenship*, 931 So.2d 137, 139–140 (Fla. 5th DCA 2006) (finding the existence of a business relationship between the plaintiffs and successful bidders in an auction for the plaintiffs' condominium units because the auction was without reserve, the plaintiffs were *obligated* to accept the lowest offers on their units no matter how little the bid was, and because more than 20 bidders posted a substantial bond and attended the auction). Significantly, the plaintiffs in *Walters* were the *solicitors* auctioning off their condominium units, and the court found that they had a protectable business relationship with the lowest bidders when the terms of the auction required them to accept the lowest bids. *Walters*, 931 So.2d at 139–40. Unlike the plaintiffs in *Walters*, DFA is a bidder for the duty-free concessions and DFA does not allege that the airports must accept the lowest bids. The very concept of there being a definite lowest bid seems foreign to the RFP process for duty-free concessions because the bidders typically offer airports a percentage of their sales. (*See* DE 1 at 15, 18.) For airports to maximize revenue, they must consider not only the percentage cut offered by each bidder, but the expected amount of sales of each bidder. An air-

port therefore cannot determine with complete accuracy which bidder will actually yield more revenue for the airport.

In light of these principles, DFA's factual allegations do not state a valid tortious-interference claim, even when construed in the light most favorable to DFA. DFA fails to allege that the agreements between DFA and the airports in *all probability* would have been completed if ELC had not interfered, and therefore fails to allege a protected business relationship. Although DFA alleges that it participated in the RFP process for duty-free concessions at the Newark, Boston, and Orlando airports, participating in this competitive bidding process does not establish a protected business relationship.

And DFA does not allege additional facts indicating that the relationship went beyond the bidding process and into negotiations which in all probability would have been completed. DFA's causation allegations—namely, that its Newark bid "was rejected because of ECL's conduct"; that its Boston bid "was rejected, at least in part, because of ELC's conduct"; and that DFA's "inability to carry ELC products was *a* central reason [its] bid was declined (DE 1 at 9–11)—do not plausibly establish that the respective airports probably would have contracted with DFA absent ELC's alleged interference. Informing a bidder that its bid was rejected because the bidder did not carry product X (here, DFA's inability to carry ELC products) does not logically imply that its bid probably would have been accepted if the bidder did carry X. And when multiple other bidders carry X but only one of them can win the bid—the precise situation in the present case [16]—the logical fallacy is even

---

**16.** DFA alleges that "there are fewer than ten major duty free store operators in the United States." (DE 1 at 14.) DFA alleges that during each bidding process, its competitors made ELC aware that DFA bid on the duty-free concessions. (DE 1 at 8–11.) A reasonable inference from this allegation is that more than one competitor carrying ELC products bid on this concession. With re-

clearer: since some bidders that carry product X will not secure the contract, carrying X does not establish that a particular bidder carrying X will likely secure the contract. DFA's allegations that it was the incumbent duty-free retailer at the Boston airport before the May 2011 is insufficient because past relationships do not establish protected future relationships.

Because DFA has not alleged a protected business relationship, its tortious-interference claim fails.

## CONCLUSION

For the above reasons, the Court **GRANTS** ELC's Motion (DE 20). DFA's claims are **dismissed without prejudice.** By June 3, 2013, DFA may file an Amended Complaint. If it does so, ELC must respond by June 24, 2013.

spect to the Boston airport, DFA alleges the identity of the competing bidders, and ELC's letter attached to DFA's complaint shows that these bidders do carry ELC products. (*Id.* at 9; DE 1–2 at 2.) And the Complaint strongly implies that the two named competing bidders for the Orlando airport carried ELC's products. (*See* DE 1 at 11.)