Filed 2/20/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ROY ALLAN SLURRY SEAL, INC., et al., <br><br> Plaintiffs and Appellants. <br><br> v. <br><br> AMERICAN ASPHALT SOUTH, INC., <br><br> Defendant and Respondent, | B255558 <br><br> (Riverside County Super. Ct. No. RIC1308832) |

APPEAL from a judgment of the Superior Court of Riverside County.  Richard J. Oberholzer, Judge.  Affirmed in part, reversed in part and remanded with directions.

Doyle & Schafer, Daniel W. Doyle and David Klehm for Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Scott K. Dauscher, Paul G. Szumiak and Jennifer D. Cantrell, for Defendant and Respondent.

_____

## INTRODUCTION

May the second-place bidder on a public works contract state a cause of action for intentional interference with prospective economic advantage against the winning bidder if the winner was only able to obtain lowest bidder status by illegally paying its workers less than the prevailing wage? We hold that the answer is yes if the plaintiff alleges it was the second lowest bidder and therefore would have otherwise been awarded the contract, because that fact gives rise to a relationship with the public agency that made plaintiff's award of the contract reasonably probable.

## FACTS AND PROCEDURAL HISTORY

Between 2009 and 2012 American Asphalt South, Inc. (American), outbid either Roy Allan Slurry Seal, Inc. (Allan), or Doug Martin Contracting, Inc. (Martin), on 23 public works contracts totaling more than $14.6 million to apply a slurry seal protective coating to various roadways throughout Los Angeles, San Bernardino, Riverside, Orange, and San Diego Counties.[1]

Allan and Martin jointly sued American in those five counties for intentional interference with prospective economic advantage and other torts, alleging that American had only been able to submit the lowest bid by paying its workers less than the statutorily required prevailing wage. (Lab. Code, §§ 1770, 1771 [contractors on public works projects must pay the prevailing wage, as determined by the Department of Industrial Relations].) Allan and Martin alleged that each was the second lowest bidder, as to, respectively, 17 and 6 of the contracts and would have been awarded those contracts as

---

[1] We have reached that figure by rounding the numbers alleged in the pleadings. The public agencies that awarded the contracts were, as follows: in Los Angeles County the cities of Pasadena, Claremont, and Downey; in San Bernardino County, the cities of Fontana, Loma Linda, Colton, Rancho Cucamonga, and Twenty Nine Palms; in Riverside County, the County of Riverside and the cities of Temecula, Murrieta, Menifee, and Riverside; in Orange County, the cities of Rancho Santa Margarita and Newport Beach; and in San Diego County, the cities of La Mesa and Coronado.

Appellants have asked us to take judicial notice of pleadings filed in other cases. We deny that request.

the lowest bidder had American's bid included labor costs based on the prevailing wage.[2] Plaintiffs alleged that each contractor's material costs were effectively the same and that the only substantial difference in their bids came from American's unlawfully deflated labor costs. Plaintiffs also alleged a cause of action for predatory pricing under the Unfair Practices Act (Bus. & Prof. Code, §§ 17000 et seq., 17043 (UPA)) and sought an injunction to enjoin American's bidding practices under the Unfair Competition Law. (Bus. & Prof. Code, § 17200 (UCL).)

American demurred to the complaints, contending that plaintiffs did not have the required existing relationship and reasonable probability of being awarded the contracts that was required to show intentional interference with prospective economic advantage. American also contended that the unfair practices and unfair competition claims were defective on grounds we discuss in detail below.

These demurrers led to conflicting rulings from three trial courts. In July 2013, the Los Angeles Superior Court overruled American's demurrers to the intentional interference with economic advantage and UCL claims, but sustained the demurrer as to the UPA claim with leave to amend. On November 5, 2013, the Riverside Superior Court sustained without leave to amend American's entire demurrer. On November 15, 2013, the San Diego Superior Court overruled American's entire demurrer. Plaintiffs appealed from the Riverside judgment in January 2014, and one week later our Supreme Court ordered all five matters coordinated for trial in Los Angeles Superior Court and for appellate purposes in the Second District Court of Appeal.

Plaintiffs contend that the Riverside trial court erred because their bid submissions created the required economic relationship for the intentional interference with economic advantage tort.

---

[2] We will refer to Allan and Martin collectively as plaintiffs.

3

**STANDARD OF REVIEW**

In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. (*Doe v. Doe 1* (2012) 208 Cal.App.4th 1185, 1188.) We do not assume the truth of contentions, deductions, or conclusions of law or fact and may disregard allegations that are contrary to the law or to a fact that may be judicially noticed. (*Ibid.*)

To the extent issues of statutory construction are raised, we apply the rules of statutory construction and exercise our independent judgment. Our first task in construing a statute is to ascertain the Legislature's intent in order to carry out the purpose of the law. If the statutory language is clear and unambiguous, no judicial construction is required. If the statute is ambiguous, the words must be construed in context and in light of the statutory purpose. (*Doe v. Doe 1, supra,* 208 Cal.App.4th at p. 1189.)

**DISCUSSION**

1.      *The Tort of Intentional Interference With Prospective Economic Advantage*

The tort of intentional interference with prospective economic advantage (intentional interference) provides a remedy to those "who suffer[] the loss of an advantageous relationship" due to the actions of "a malicious interloper." (*Zimmerman v. Bank of America* (1961) 191 Cal.App.2d 55, 57.) "[T]he mere fact that a prospective economic relationship has not attained the dignity of a legally enforceable agreement does not permit third parties to interfere with performance." (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 827 (*Buckaloo*), disapproved on other grounds in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393, fn. 5.) The tort is considerably more inclusive than actions for interference with contract, and therefore

4

does not depend on the existence of a valid contract. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1157 (*Korea Supply*).)

In order to state a cause of action for this tort, a plaintiff must allege five elements. First, the existence of an economic relationship with some third party that makes it reasonably probable the plaintiff will gain some future economic benefit. This protects the expectation that the relationship will eventually produce the desired benefit, not the speculative expectation that a potentially beneficial relationship will arise. (*Korea Supply, supra,* 29 Cal.4th at p. 1164.)

Second, the defendant must have knowledge of the plaintiff's economic relationship. (*Korea Supply, supra,* 29 Cal.4th at p. 1164.)

Third, the defendant must have engaged in wrongful acts designed to disrupt the plaintiff's relationship. This requires allegations that the defendant engaged in an independently unlawful act separate and apart from the acts of interference and that the defendant either intended to interfere or acted with the knowledge that interference was certain or substantially certain to occur. (*Korea Supply, supra,* 29 Cal.4th at pp. 1164-1165.) This does not require that the plaintiff have been identified by name, however, and it is enough that the defendant was aware its actions would frustrate the legitimate expectations of a specific, albeit unnamed, party. (*Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1132-1133.)

Fourth, plaintiffs' economic relationship was actually disrupted. (*Korea Supply, supra,* 29 Cal.4th at p. 1165.)

Fifth, plaintiffs suffered economic harm that was proximately caused by defendant's interference. (*Korea Supply, supra,* 29 Cal.4th at p. 1165.)

2. *Plaintiffs, as the Lawful And Second Lowest Bidders, Had a Reasonably Probable Economic Expectancy that They Would be Awarded the Contracts*

The competitive bidding laws for public works contracts are designed to protect the public, not bidders. (See *Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449, 456; *Universal By-Products, Inc. v.*

5

*City of Modesto* (1974) 43 Cal.App.3d 145, 152.) Therefore while public agencies are generally expected to accept the bid of the lowest responsible bidder, they still have discretion to reject all bids or accept one of multiple bids that have tied as the lowest.[3] (Pub. Contract Code, §§ 10122, subd. (d), 20166, 22038, subd. (b).)

Based on appellate decisions applying this principle in various contexts, which we discuss *post*, American contends that losing bidders are barred from suing their successful competitors for intentional interference because there was no existing relationship with which to interfere and no reasonable probability that any contract would ever have been awarded.

No reported California decision has reached this issue. We turn for guidance to two decisions of the California Supreme Court: *Korea Supply, supra,* 29 Cal.4th 1134, and *Buckaloo, supra,* 14 Cal.3d 815. The *Buckaloo* court, which first articulated the elements of the intentional interference tort, noted that the tort could be established by showing interference with a contract "which is certain to be consummated." (*Buckaloo,* at p. 823, fn. 6, citing *Builders Corporation of America v. United States* (N.D. Cal. 1957) 148 F.Supp. 482, 484, fn. 1, rev'd. on other grounds (9th Cir. 1958) 259 F.2d 766.)

Drawing upon this principle, the *Korea Supply* court considered the pleading requirements of an intentional interference cause of action brought by the agent of the losing bidder on a contract to supply military radar equipment to the government of South Korea. The agent alleged that the winning bidder obtained the contract by providing bribes and sexual favors to key Korean officials, in violation of the federal Foreign Corrupt Practices Act. (15 U.S.C. § 78dd-2.) The agent alleged that its principal's product was superior and its bid was significantly lower than defendant's bid, that but for defendant's misconduct its principal would have been awarded the contract, and that as a result the agent lost the commission it would have otherwise obtained.

---

**3**      A responsible bidder is one "who has demonstrated the attribute of trustworthiness, as well as quality, fitness, capacity, and experience to satisfactorily perform the public works contract." (Pub. Contract Code, § 1103.)

6

The trial court sustained the defendant's demurrer without leave to amend, but the Court of Appeal reversed, in part because it concluded the plaintiff did not have to plead and prove that the defendant acted with the specific intent to interfere with the plaintiff's business expectancy. *Korea Supply* dealt primarily with that issue, agreeing with the Court of Appeal that specific intent to disrupt a plaintiff's business expectancy was not an element of the intentional interference tort. (*Korea Supply, supra,* 29 Cal.4th at pp. 1156-1157.)

The *Korea Supply* court went on to discuss the elements of the intentional interference tort and how they limit the class of potential plaintiffs. In regard to the existence of an economic expectancy, the *Korea Supply* court held that one existed even though the plaintiff agent did not allege that it had a contractual agreement with its principal, and instead "merely alleged that it had an economic expectancy in that it was acting as [the principal's broker] and it expected a commission if the contract was awarded . . . ." (*Korea Supply, supra,* 29 Cal.4th at p. 1157.) In regard to proximate cause, the *Korea Supply* court recounted plaintiff's allegations that its principal would have been awarded the contract absent defendant's misconduct, leading directly to plaintiff's lost commission. Those allegations were sufficient to establish proximate cause. (*Id.* at pp. 1165-1166.)

Elsewhere in the decision, the *Korea Supply* court recognized that the plaintiff was an indirect victim of the defendant's alleged misconduct. (*Korea Supply, supra,* 29 Cal.4th at pp. 1162-1163.) This makes sense because in order to interfere with the plaintiff-agent's expectation of receiving a commission, the defendant had to first derail acceptance of the principal's superior bid. Essential to *Korea Supply's* proximate cause discussion, therefore, is the notion that the defendant intentionally interfered with the losing bidder's viable contractual expectancy.[4]

---

[4]    We recognize that *Korea Supply* did not directly reach this issue, but whether by design or an intuitive leap of logic, it seems inescapable to us that the *Korea Supply* plaintiff's ability to show proximate cause rested on this notion.

7

We see little functional difference between the allegations concerning the unsuccessful bidder in *Korea Supply* and those made by plaintiffs in this case. Plaintiffs here alleged that as the second lowest bidders they would have been awarded the contracts but for American's interference. Implicit in this is the allegation that the various public entities were required to award the contract to the lowest responsible bidder and that plaintiffs satisfied all the requirements necessary to qualify for those contracts.[5] Although plaintiffs here did not submit the lowest bids, that was alleged to be due solely to American's violation of its statutory obligation to pay its workers the prevailing wage. As in *Korea Supply,* absent that alleged misconduct it was plaintiffs who in fact submitted the true and lawful lowest bids.

Citing *Pacific Architects Collaborative v. State of California* (1979) 100 Cal.App.3d 110, 121-122 (*Pacific Architects*), *Swinerton & Walberg Co. v. City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, 101 (*Swinerton*), *Rubino v. Lolli* (1970) 10 Cal.App.3d 1059, 1062 (*Rubino*), and *Charles L. Harney, Inc. v. Durkee* (1951) 107 Cal.App.2d 570, 580 (*Harney*), American contends that a disappointed bidder has no legally protectable expectancy interest in being awarded a contract. We first summarize the four cases and then conclude they are inapplicable here.

The plaintiff in *Pacific Architects, supra,* 100 Cal.App.3d 110, sued the state to recover its bid preparation costs and lost profits when it submitted the lowest bid, but the state rejected all bids after discovering it had insufficient funds for the project. Based on the state's discretion to reject all bids, the appellate court affirmed a summary judgment for the state, holding that government immunity protected it from tort liability and that promissory estoppel was not available as a remedy either. (*Id.* at pp. 121-122, 124.)

The plaintiff in *Rubino, supra,* 10 Cal.App.3d 1059, submitted the lowest bid on a state project and sued the director of the agency after the contract was awarded to another

_____

[5] Plaintiffs allege, and American does not dispute, that the basic principle of public contracting law applies here – if a contract is awarded, it must be awarded to the lowest responsible bidder.

8

bidder.  The *Rubino* court held that the ability to reject and award bids vested the director with discretion, and that his abuse of that discretion qualified for government immunity in a tort action for damages.  (*Id.* at p. 1062.)  Even so, the *Rubino* court noted that a mandate action might have been available to restrain the agency from awarding the contract if the agency abused its discretion.  (*Ibid.*, citing *Baldwin-Lima-Hamilton Corp. v. Superior Court* (1962) 208 Cal.App.2d 803, 824-826.)

The plaintiff in *Swinerton, supra,* 40 Cal.App.3d 98, was the lowest bidder on a project and sued the public agency in tort and for promissory estoppel when the contract was awarded to someone else.  Although *Rubino's* government immunity principles applied to the tort claim against the public agency (*id.* at pp. 101-102), promissory estoppel was held available to compensate the plaintiff for its bid preparation costs.  (*Id.* at pp. 103-105.)  In particular, the *Swinerton* court noted, despite the public agency's discretion to reject all bids, allowing recovery under a promissory estoppel theory was important to prevent making the agency's promise to award the contract to the lowest bidder illusory and "render the whole competitive bidding process nugatory."  (*Id.* at p. 104.)  Significantly, the plaintiff was allowed to state a cause of action against the winning bidder for conspiring with the agency to award it the contract.  (*Id.* at p. 106.)

The plaintiff in *Harney, supra,* 107 Cal.App.2d 570, was the lowest bidder on a public works project, but its bid was nearly 18 percent over the agency's initial estimate. When the agency discovered that its calculations were wrong, it rejected all the bids and then revised its estimate and took new bids.  The plaintiff brought a mandate action seeking to compel the agency to award it the contract, but the appellate court held that bidders on public works contracts had no right to be awarded the contract where the statute gave the agency discretion to reject all the bids.  (*Id.* at p. 580.)

We believe these four decisions have no application here.  Each in some measure rests on government immunity principles arising from an agency's discretion to reject or accept bids.  Two – *Swinerton* and *Rubino* – recognized that the lowest bidder in fact has an enforceable right in mandate to stop a public agency from improperly awarding a contract.  Our Supreme Court later endorsed *Swinerton's* promissory estoppel rationale.

9

(*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 314-317.)  None of American's authorities involved an intentional interference claim brought by a losing bidder against the winning bidder, but *Swinerton* did endorse a tort remedy on a conspiracy theory against the winning bidder.

Nor is this a case where the public agency exercised its discretion to reject all bids. As alleged, the public agencies in fact awarded the 23 disputed contracts to the company they were duped into believing was the lowest responsible bidder in each instance. Furthermore, the bidder-versus-public agency decisions are based on the principle that the public contracting laws are designed to protect the public.  While that policy makes sense in order to protect taxpayers from damage awards against a public agency on top of the contract price that went to the successful bidder, its application in this context is far from clear.  This action seeks damages from only the winning bidder and therefore does not call for protection of the public.  And while taxpayers gain some financial benefit by contracting with businesses that pay less than the statutorily required prevailing wage, American does not contend, and we believe no court would hold, that such an advantage is worthy of judicial protection.

Relying on *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507 (*Westside Center*), American also contends plaintiff's intentional interference cause of action fails because it "must have interfered with a specific existing relationship, not simply with the formation of one in the future." (*Id.* at p. 525.)  Implicit in this contention is the notion that no economic expectancy exists until a bid is accepted.

We do not believe *Westside Center* is applicable here.  The plaintiff in that case was a shopping center owner.  The anchor tenant was Safeway.  Ownership of the center was fragmented and the Safeway store property was owned by a separate trust.  The plaintiff sued Safeway for intentional interference, alleging that after Safeway closed its store in the center, Safeway renewed its lease option for another five years with the intent to drive down the price of the center as its store sat vacant and then buy it at a reduced price.

10

Plaintiff alleged two types of interference:  (1)  with its attempt to purchase the Safeway property from the trust; and (2)  a theory of "interference with the market" based on the claim that Safeway's conduct interfered with plaintiff's ability to negotiate with an unidentified class of all potential buyers.  It was the latter group of speculative, unidentified potential tenants to whom the *Westside Center* court referred when holding that a specific, existing relationship was required.  (*Westside Center, supra,* 42 Cal.App.4th at pp. 523-527.)  As for plaintiff's failed negotiations with the trust, the issues on appeal concerned the trial court's findings that there was no evidence Safeway intended to disrupt a known relationship and that plaintiff's damages were speculative, findings that the Court of Appeal affirmed.  (*Id.* at pp. 529-530.)

We conclude that plaintiffs, as the alleged lawful lowest bidders, had a tangible expectancy the contracts would be theirs, an expectation that was thwarted only by American's unlawful conduct.  As *Korea Supply* suggests, a bidder on a government contract who submits a superior bid and loses out only because a competitor manipulated the bid selection process through illegal conduct has been the victim of actionable intentional interference.  This is consistent with the notion that the true lowest bidder may bring a mandate action to compel the public agency to reverse its previous decision improperly awarding a contract.  Absent some enforceable right, such mandate actions would not be possible.[6]

The dissent complains that we have employed a temporally backward analysis by relying on American's alleged wrongful conduct to create an existing economic relationship where none otherwise exists.  We cannot agree.  Instead, we conclude that an actionable economic expectancy arises once the public agency awards a contract to an unlawful bidder, thereby signaling that the contract would have gone to the second lowest qualifying bidder.  We see no reason to cut off any legal effect from the winning bidder's misconduct simply because it precedes the completion of the bidding process.  Assuming

---

[6]     Where, as alleged here, the misconduct was not discovered for some time, a mandate action to halt the contract award was not feasible, leaving plaintiffs with no other remedy.

11

that the timing had some legal significance, the defendant's wrongful conduct persists throughout the bidding process, well past the time when it is wrongly awarded the public works contract. In short, by continuing its unlawful conduct after wrongly winning the contract, the defendant interferes with an expectancy that would have otherwise materialized.

We also observe that under *Korea Supply,* any subcontractors plaintiffs had lined up would have at least as great an economic expectancy as did the plaintiff-agent in that case. Under the dissent's reasoning, however, our plaintiffs would not. As stated before, *Korea Supply* implicitly rejects that result.

American contends that recognizing the intentional interference tort in this case is bad public policy because it will open the floodgates to actions by disappointed bidders and will lead to the release of a defendant's confidential and proprietary trade information through pretrial discovery. This argument was expressly rejected by the court in *Korea Supply* when it said, "We do not share the concern of Lockheed Martin and the concurring and dissenting opinion that our ruling today will expose defendants to an unlimited number of potential plaintiffs." (*Korea Supply, supra,* 29 Cal.4th at p. 1163.) In any event, we limit our holding to losing bidders who can show they were the actual and lawful lowest bidders on a public works project.[7]

---

[7]     As we discuss in Section 4, *post,* the Legislature provides for civil actions against winning bidders of public works contracts obtained by violation of the laws requiring them to furnish workers compensation and unemployment insurance. (Lab. Code, § 1750; Pub. Contract Code, §§ 19102, 20104.70.) This statutory scheme reflects a legislative statement that private tort claims are reasonable tools in the protection of employees' rights. By implication, these statutes reject American's floodgate argument.

We also observe that liability under those statutes extends to a far broader category of potential plaintiffs – not just the second place bidder, but also various subcontractors and other businesses that would have benefitted had the losing bidder obtained the contract. Even with that breadth, there are no reported appellate cases that discuss tort claims filed under those statutes. It may be that the requirement in those provisions of a criminal conviction as prerequisite to suit places a statutory damper on such claims.

We believe that sound policy reasons support our recognition that the intentional interference tort applies here. The central purpose of the prevailing wage law is to protect and benefit employees on public works projects. (*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 776.) It also: serves to protect employees from substandard wages that might be paid by contractors who recruit labor from distant cheap-labor areas; lets union contractors compete with non-union contractors; benefits the public through the superior efficiency of well-paid workers; and compensates private sector workers with higher wages to make up for the absence of job security and employment benefits enjoyed by public employees. (*Ibid.*) Even though violators who are caught may face civil penalties and assessments (Lab. Code, § 1741), and may be sued by *employees* who did not receive the prevailing wage (*Road Sprinklers, supra,* at p. 777), allowing actions like plaintiffs' to proceed will further promote these goals by adding an extra disincentive to discourage unscrupulous contractors from violating the prevailing wage laws. It also provides an additional level of scrutiny to bidding practices by unsuccessful bidders. Taxpayers are not at risk from damage awards in such cases. Whether a plaintiff was in fact the second lowest bidder and would have been awarded a contract had the winning bidder complied with the prevailing wage law is a factual issue susceptible to standard civil discovery practices and is amenable to proof at trial.[8]

Most important, a contrary decision would not be limited to actions against contractors who obtain public agency contracts by violating the prevailing wage laws. If we affirm, we would effectively hold that no losing bidder could ever sue a competitor for interfering with the bidding process no matter how egregious the misconduct because

---

[8]     A defendant's alleged failure to pay the prevailing wage is calculable because that rate is established by the Department of Industrial Relations. (Lab. Code, § 1770.) Whether a plaintiff was the second lowest bidder and whether the public agency would have awarded a particular contract to that plaintiff can be established by conducting discovery of the relevant officials involved in the bidding and contract award process.

13

no economic relationship exists until and unless its bid is accepted.[9] It does not require much imagination to envision a contractor who obtains a public works contract by bribery, extortion, or familial connections. (See *Korea Supply*, *supra,* 29 Cal.4th 1134, 1140 [bribes and sexual favors].) At bottom, the intentional interference tort was designed to protect an economic expectancy that showed a reasonable probability of coming into being. A bidder on a public agency contract who in fact submits the lawful lowest bid has such an expectancy, and it should not be thwarted by a competitor's illegal conduct.[10]

3.      *Decisions from Other States Expressly or Implicitly Permit Losing Bidders to Sue for Intentional Interference*

American cites three decisions from other jurisdictions to support its contention that an intentional interference cause of action is not allowed under these circumstances, and urges us to follow those cases and to decline to extend the tort. Close examination of those decisions undercuts American's reliance on those cases.

The first is *Powercorp Alaska, LLC v. Alaska Energy Auth.* (Alaska 2013) 290 P.3d 1173 (*Powercorp*).) The plaintiff in *Powercorp* manufactured components used to improve the operation of power generation plants. It sued a public agency that

---

**9** Although we rule in the context of public agency contracts, we note that under American's reasoning there is even less chance of establishing an actionable economic expectancy where bidding on private contracts is concerned. At least public agencies must accept the lowest responsible bid, a factor that we find significant here, where plaintiffs were in fact the responsible lowest bidders. Where private bidding is concerned, restraints may not apply.

**10** We asked the parties to provide supplemental briefs on the following issues: (1) whether a losing bidder's past history of successful bids to a public agency creates an existing economic relationship; (2) if so, whether plaintiffs could allege that fact here; and (3) if so, whether plaintiffs should be allowed to amend their pleadings accordingly. Both parties essentially agree that a past history of successful bids, in and of itself, is insufficient to create an existing economic relationship, and we agree. We do believe that fact may be relevant in determining whether plaintiffs were "responsible bidders," under the public contracts statutes (Pub. Contract Code, § 1103), and also may be relevant to the element of proximate causation.

14

awarded a contract to a competitor, along with a public agency employee who allegedly disclosed trade secrets in order to assist the competitor in the bidding process. In affirming summary judgment for the employee on a cause of action for intentional interference, the Alaska Supreme Court noted that the submission of a bid entitles the bidder to only fair and honest consideration and does not "provide any one bidder with a contract expectancy superior to the rights of other bidders." (*Id.* at p. 1187, fn. omitted.)

Based on this language, American contends that *Powercorp* supports its claim that plaintiffs had no valid contract expectancy. However, in the next sentence the *Powercorp* court holds: "In this case, Powercorp did not submit a bid; the bid-protest hearing officer concluded that 'Powercorp could have responded, substituting [the preferred controller] for its own controller, but it chose not to because . . . it is not interested in building systems using other controllers.' Powercorp has not produced other evidence to contradict the hearing officer's conclusion. Powercorp has not shown that but for [the defendant employee's] interference, it expected to enter a contract with [the public agency] from which it would derive economic benefits." (*Powercorp, supra,* 290 P.3d at p. 1187.) We understand American's reliance on the former passage, but the latter casts some doubt on what part it played in the court's holding. If, as the latter quoted portion suggests, no expectancy arose because the plaintiff never actually bid on the project, then arguably *Powercorp* can be read to endorse intentional interference claims when a bid has been submitted.

Furthermore, *Powercorp* appears at odds with an earlier Alaska Supreme Court decision: *J & S Services, Inc. v. Tomter* (Alaska 2006) 139 P.3d 544 (*Tomter*). The plaintiff in *Tomter* was the unsuccessful bidder on a contract to lease an airplane to a state firefighting agency. The plaintiff sued the agency and its director of aviation, alleging that the director held a grudge against it and wrongfully steered the contract to a friend's company. Although the action was barred as to the state because an exclusive statutory remedy existed, the Alaska Supreme Court held that an intentional interference cause of action might be viable against the director for misconduct committed outside his official

15

capacity, and allowed the plaintiff leave to amend to flesh out his allegations of wrongdoing. (*Id.* at pp. 551-552.)

The second decision cited by American is *Cedroni Assocs. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.* (2012) 492 Mich. 40 (*Cedroni*). The plaintiff in *Cedroni* was the lowest bidder on a school construction project. Plaintiff sued the school district's architect for intentional interference, contending that the architect acted out of spite when it recommended the contract be awarded to another.

In affirming a summary judgment for the architect, the Michigan Supreme Court held that the absence of a contractual expectancy arose from the same principles that prevented a losing bidder from suing the public agency that awarded the bid to someone else. (*Cedroni, supra,* 492 Mich. at pp. 46-47.) However, this holding was augmented by additional factors: in its request for proposals, the school district expressly retained authority to reject any or all bids, stated that it might not necessarily award the contract to the lowest bidder, and made it clear that the architect would play a role in determining whether a bidder was "responsible" under the applicable statutes. (*Id.* at pp. 48-50.) The public agency also found that the plaintiff was not a responsible contractor. (*Id.* at p. 53.)

It was under these circumstances that the *Cedroni* court held the plaintiff's status as lowest bidder did not create a valid contractual expectancy for purposes of the intentional interference cause of action. (*Id.* at pp. 52-54.) We find *Cedroni* distinguishable because the only one of the *Cedroni* factors present here was the public entities' ability to reject all bids, a factor we believe was ameliorated once the public entities here chose to accept what they believed were the lawful lowest bids. Furthermore, one federal court applying Michigan law distinguished *Cedroni* in a case where the defendant's wrongful interference occurred after plaintiff's bid had been unveiled as the lowest one and the public agency had begun negotiations to finalize the deal. (*360 Constr. Co. v. Atsalis Bros. Painting Co.* (E.D. Mich. 2012) 915 F.Supp.2d 883, 900-901.) Another federal court applying Michigan law held that a valid business expectancy arose when the plaintiff produced evidence that it had supplied the only

16

qualifying bid.  (*Maiberger v. City of Livonia* (E.D. Mich. 2010) 724 F.Supp.2d 759, 778.)

The third decision cited by American is *Duty Free Ams., Inc. v. Estée Lauder Co.* (S.D. Fla. 2013) 946 F.Supp.2d 1321 (*Duty Free*).  The plaintiff in *Duty Free,* an operator of duty-free stores in airports, sued one of its former suppliers for intentional interference with the plaintiff's bids to obtain additional airport retail outlets, alleging that the supplier violated federal antitrust laws by making disparaging comments about plaintiff.  Applying Florida law, the *Duty Free* court held that the plaintiff failed to state a claim for tortious interference based solely on its bids to obtain more retail space because the mere fact of making a bid did not create a protectable business relationship.  (*Id.* at pp. 1338-1339.)

While American points to that portion of the *Duty Free* decision, it omits the rest of the analysis, which noted that the plaintiff was not bidding with an entity that was required to accept the lowest bid and that a protectable business relationship might exist in those situations.  (*Duty Free, supra,* 946 F.Supp.2d at p. 1339.)  The plaintiff might have also succeeded, the court noted, had it alleged additional facts indicating that the relationship went beyond the bidding process into negotiations which likely would have been completed.  (*Ibid.*)

Not only do the three sister-state decisions cited by American either reject or at least undercut its contentions, our research has turned up decisions from several jurisdictions that either expressly or by implication allow the cause of action, and none that expressly forbids it.

In *Killian Construction Company v. Jack D. Ball & Associates* (Mo.App. S.D. 1993) 865 S.W.2d 889, a Missouri appellate court held that the disappointed bidder on a school construction project could state a claim for intentional interference against the successful bidder and the school district's architectural consultant, alleging that it had been the lowest bidder but lost the contract due to certain misconduct by defendants.  Directly addressing whether a valid business expectancy existed under those circumstances, the *Killian* court held that the losing bidder's inability to establish a

17

binding contractual relationship with the public agency did not preclude the bidder from showing a protectable business relationship based on its status as the lowest bidder. "Based upon the facts in the petition, a business expectancy was shown. Under normal circumstances it would be expected that a school district, in order to save $24,000, would make its contract with plaintiff, and not [the other bidder]. Where a proper bid is made, we cannot say as a matter of law that the lowest bidder by a substantial amount could not have a valid business expectancy that it would receive the contract if awarded." (*Id.* at p. 892.)

In *R. S. Noonan, Inc. v. School District of City of York* (1960) 400 Pa. 391, the Pennsylvania Supreme Court held that the losing bidder for a school construction project could not bring what was essentially a taxpayer's mandate action to compel the school district to award it the contract. The plaintiff also sued the school district's architect for interfering with the bidding process. Albeit with no real discussion, the court held that the architect's actions were privileged, but added that the "allegation sounds in tort, for which there is an adequate remedy at law." (*Id.* at p. 396.)

In *National R.R. Passenger v. Veolia Transportation Services* (D.C.C. 2009) 592 F.Supp.2d 86, Amtrak sued another rail company for interfering with its bid to provide railway services in Florida. Applying District of Columbia law, the *National R.R. Passenger* court held that Amtrak could state a cause of action for intentional interference. On the issue of whether a valid business expectancy existed, the court held that Amtrak succeeded by alleging it had a legitimate expectation of winning the contract because it met the bid requirements, had highly qualified employees, had an opportunity to acquire the Florida rail company as a new customer, and was the only other bidder. (*Id.* at p. 98.)

Other courts have disallowed intentional interference claims by losing bidders, but not because they were unable to establish a valid business expectancy. Instead, these decisions turned on other pleading defects, at least suggesting that absent those defects the claims would survive. (*Technology for Energy Corp. v. Scandpower, A/S* (6th Cir. 1989) 880 F.2d 875 [applying California law, held losing bidder on contract to supply

18

nuclear reactor technology failed to state cause of action for intentional interference against competitor because allegations did not show proximate cause, namely that but for misconduct it was reasonably probable the business expectancy would have materialized]; *Soderlund Bros. v. Carrier Corp.* (1995) 278 Ill.App.3d 606 [summary judgment for defendant bidder affirmed where evidence showed its conduct was privileged]; *Boyle Service v. Dewberry Design Group* (Okla.Civ.App. Div.3 2001) 24 P.3d 878 [summary judgment for defendant project architect and engineer affirmed where evidence showed they did not intend to interfere with prospective economic advantage]; *Bard Tree Co. v. City of Oak Ridge* (Tenn. 2010) 326 S.W.3d 156 [summary judgment granted for defendants who allegedly interfered in plaintiff's tree trimming bid; the plaintiff never submitted a valid bid].)

4.      *The Statutory Remedies for Certain Unsuccessful Bidders are not Exclusive*

In 1991 the Legislature added two provisions to the Public Contract Code that allowed the second lowest bidder on certain public works contracts to sue and seek damages from a successful bidder who obtained the contract through violations of the laws concerning workers compensation and unemployment insurance:  Public Contract Code sections 19102 and 20104.70.  The statutes require criminal convictions as a prerequisite to civil suit.  (Stats. 1991, c. 906 (A.B. 1754), § 3.)

Public Contract Code sections 19102 and 20104.70 are identical.  They provide:

"(a) (1)  The second lowest bidder, and any person, firm, association, trust, partnership, labor organization, corporation, or other legal entity which has, prior to the letting of the bids on the public works project in question, entered into a contract with the second lowest bidder, may bring an action in superior court if that entity suffers damages as a result of the bid of the second lowest bidder not being accepted due to the successful bidder's violation, as evidenced by the conviction of the successful bidder thereof, of any provision of Division 4 (commencing with Section 3200) of the Labor Code [workers compensation laws] or of the Unemployment Insurance Code, or of both."

Subdivision (c)(2) defines the second lowest bidder as "the second lowest qualified bidder deemed responsive by the public agency awarding the contract for public work."

American contends that these two statutes evince a comprehensive statutory scheme whose omission of claims based on violations of the prevailing wage law shows that the statutory remedies are exclusive and therefore bar plaintiffs' intentional interference claims. Plaintiffs contend that the legislative history of these provisions does not show such intent. American counters that under the rules of statutory construction: (1) the Legislature could have provided a remedy for prevailing wage violations but chose not to do so, indicating its intent to preclude those claims; (2) the Legislature's creation of these statutory rights shows they were intended to be exclusive, thus barring intentional interference claims that are perpetrated by means of other kinds of wrongful conduct; and (3) the allowance of claims based on only two worker protection laws shows an intent to exclude all others.[11]

After reviewing the legislative history, we have no doubt that the Legislature did not intend to include prevailing wage violations as a basis for recovery under Public Contract Code sections 19102 and 20104.70. An Assembly committee report prefaced its analysis of the proposed legislation with the statement that "[e]xisting law requires the payment of prevailing wages to workers employed by private contractors on public works projects valued at $1,000 or more. When a public agency (awarding body) decides to advertise a public works contract, it must obtain the applicable prevailing rates from the Director of Industrial Relations (DIR), and include them in the advertisement of the bids and the contract. Other mandatory requirements of successful bidders include workers compensation coverage and unemployment insurance for workers. [¶] This bill would

---

[11] The parties also cite, and the trial court relied on, Labor Code section 1750, which is identical in all material respects to the two Public Contract Code sections with one notable exception: Labor Code section 1750 applies to only a class of public works projects that does not include street repairs. (Lab. Code, § 1750, subd. (b)(1) [applicable to construction, repair, remodeling, and other similar tasks performed on public buildings or structures].) It is therefore inapplicable here.

20

permit any . . . bidder for a public works contract to file a civil action against competitors when it has suffered damages as a result of losing bids to competitors who knowingly violate statutory requirements to provide unemployment insurance or workers' compensation insurance to employees." (Assem. Com. on Labor and Employment, Rep. on Assem. Bill No. 1754 (1991-1992 Reg. Sess.) May 1, 1991, p. 1.)[12]

We observe that two bill analyses suggested that a new cause of action was being created where none existed. One report described the proposed legislation as "creat[ing] a statutory cause of action for damages." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1754 (1991-1992 Reg. Sess.) Aug. 27, 1991, p. 3.) Another stated that second lowest bidders currently had no recourse if they lost out on a contract award because a competitor violated the workers compensation and unemployment insurance laws. (Cal. Dept. of Employment Development, Enrolled Bill Rep. on Assem. Bill No. 1754 (1991-1992 Reg. Sess.) Sept. 20, 1991, p. 2.) Nothing in the statutes or legislative history suggests the law applies to interference claims based on prevailing wage violations.

Whatever heft those legislative history fragments might bring to American's appellate arguments is outweighed by the "new-right—exclusive remedy" rule of statutory construction and its counterpart, the doctrine of "preexisting right—cumulative remedies." When a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy generally is exclusive. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 79.) When a statutory remedy is provided for a preexisting common law right, however, the newer remedy is considered cumulative, leaving the plaintiff free to elect the older remedy. (*Ibid.*)

---

[12] The purpose of the bill was to fight the "underground economy" fostered by businesses that did not pay their fair share of taxes (Assem. Com. on Labor and Employment, Rep. on Assem. Bill No. 1754 (1991-1992 Reg. Sess.) May 1, 1991, p. 2), and to help the Employment Development and Industrial Relations departments investigate and instigate the prosecutions of employers who fail to provide their employees workers compensation and unemployment insurance. (Cal. Dept. of Employment Development, Enrolled Bill Rep. on Assem. Bill No. 1754 (1991-1992 Reg. Sess.) Sept. 20, 1991, p. 2.)

Just because we hold that the second lowest bidder on a public works project can state a cause of action for intentional interference against the successful bidder does not mean we have created a new cause of action. "The concept that there are no causes of action except those that have been recognized by precedent, assumed at some point in the common law, was not accepted generally at early common law, nor is it accepted today." (*Rosefield v. Rosefield* (1963) 221 Cal.App.2d 431, 435; see 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 19, p. 73.) A liability is *created* only by statute where the liability is embodied in a statute and was "*of a type* which did not exist at common law." (*Briano v. Rubio* (1996) 46 Cal.App.4th 1167, 1176, quoting *Jackson v. Cedars-Sinai Medical Center* (1990) 220 Cal.App.3d 1315, 1320, italics added.) If the liability would exist in some form regardless of the statute, it is not a liability created by statute. (*Lehman v. Superior Court* (2006) 145 Cal.App.4th 109, 118-119.) As a result, because the intentional interference tort predates the Public Contract Code remedies, those remedies cannot be deemed exclusive unless there is some expression of legislative exclusivity.[13]

We look to the legislative history and the rules of statutory construction to determine whether the Legislature intended an exclusive remedy. (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 396-397 [distinguishing cases where intent to create exclusive remedy rested only on an assumption to that effect, or an inference drawn from rules of statutory construction].) Neither the statutes nor the legislative history mentions, much less suggest, that an exclusive remedy was contemplated. At best, the legislative history is ambiguous on this point.

Ultimately, we turn to the rule of statutory construction that abhors absurd, harsh, or mischievous results. (*Starbucks Corp. v. Superior Court* (2008) 168 Cal.App.4th 1436, 1449.) This case is about far more than allowing intentional interference claims based on a winning bidder's prevailing wage violations. If the statutory remedies are exclusive, then they bar all intentional interference claims other than those arising from a

---

[13]    The tort of intentional interference with prospective economic advantage dates back to at least *Zimmerman v. Bank of America, supra,* 191 Cal.App.2d at p. 57.)

winning bidder's failure to provide workers compensation or unemployment insurance. It is a well-established rule of statutory construction that the Legislature does not intend to legislate contrary to existing public policy. (*Meninga v. Raley's, Inc.* (1989) 216 Cal.App.3d 79, 89-90.) We refuse to believe that the Legislature intended to preclude common law causes of action by a second place bidder who lost because, as in *Korea Supply, supra,* 29 Cal.4th 1134, the winning bidder plied those in charge of the bidding process with bribes and sexual favors or, as in this case, by not paying prevailing wages.[14]

5.       *An Independent Wrongful Act Occurred at the Time of Bidding*

American contends that its failure to pay the prevailing wage was not an independently wrongful act for purposes of the intentional interference tort because its duty to pay those wages did not accrue until work began, long after the bidding process was over. American relies on *Fanelli, Antuzzi, Bonacorsi Painting, Inc. v. Santa Clara Unified School District* (1983) 141 Cal.App.3d 686, 691 (*Fanelli*) for this proposition.

In *Fanelli, supra,* the Division of Labor Standards Enforcement sued a painting contractor and a school district for the contractor's failure to pay the prevailing wage for work done for the district. The painter cross-complained against the district for indemnity, alleging that the district failed to notify the contractor of its prevailing wage obligations at the time of bidding and by failing to post a wage notice at the jobsite. The Court of Appeal affirmed a summary judgment for the district on the indemnity issue because the district had complied with the advance notice requirements by making copies of the prevailing wage information available at its office. As for the district's failure to post a notice at the jobsite, the *Fanelli* court held that the omission did not cause the contractor to remain unaware of its prevailing wage obligations because the notice was to

---

[14]       What we draw from these provisions is legislative recognition that the rights of lawful lowest bidders on public works contracts are worthy of protection when those contracts are obtained due to the winning bidder's violations of certain laws.

23

be posted at the jobsite, which could only occur after the bidding process ended. (*Fanelli, supra,* 141 Cal.App.3d at p. 691.)

We fail to see how *Fanelli* applies here at all. The obligation to post prevailing wage notices at a jobsite has nothing to do with a contractor's obligation to submit a bid based on the prevailing wage rates. That obligation exists at the time bids are submitted, and American's alleged failure to do so in order to obtain contracts under false pretenses occurred at that point. (*San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1545 ["[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard . . . ."].)

6.    *American's Conduct Was Not Privileged*

American contends that its conduct amounted to no more than sharp elbow competition among business competitors and was therefore privileged. However, the competition privilege does not apply to unlawful or illegitimate means. (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 843.) Obtaining a public works contract by intentionally violating the prevailing wage laws is clearly unlawful, thereby defeating the privilege.

7.    *Duty, Standing, and Proximate Cause Issues*

American also contends its demurrer was properly sustained because it had no duty as to plaintiffs to comply with the prevailing wage laws, plaintiffs have no standing to enforce those laws, and the proximate cause of the contracts being awarded to American was the decisions reached by the various public entities, not any misconduct by American.

These contentions merit little discussion. Plaintiffs do not seek to enforce the prevailing wage laws; they seek to enforce their right to compete for public works contracts free of unlawful manipulation by their competitors. The duty American allegedly breached was the duty to not interfere with plaintiffs' prospective economic

24

advantage by violating the prevailing wage laws in order to make it appear as if American were the lowest bidder.  Finally, if, as alleged, plaintiffs submitted the true lowest bids and American was able to misrepresent itself as the lowest bidder by violating the prevailing wage laws, then that misconduct was the proximate cause of the public works contracts being awarded to American instead of plaintiffs.  (*Korea Supply, supra,* 29 Cal.4th at pp. 1165-1166.)

8.      *The Demurrer Was Properly Sustained as to the UCA Cause of Action*

It is unlawful for a business to sell its goods and services below cost with the intent of harming competition.  (Bus. & Prof. Code, § 17043 ["It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."]; § 17024 includes "article or product" to include service].)  Here, plaintiffs allege American engaged in predatory pricing by providing its repaving and road repair services below cost.  American demurred to the cause of action on the grounds that its alleged failure to pay the prevailing wage did not result in predatory pricing because its lower wages also lowered its costs.

Plaintiffs' cause of action for predatory pricing misses the mark.  Plaintiffs alleged that American could underbid them because American did not pay its employees the prevailing wage.  The logic of plaintiffs' complaint was not that American provided its service below cost, but that American unlawfully reduced its costs by not paying the prevailing wage, and by doing so could underbid plaintiffs.  Selling below cost is predatory pricing, but lowering one's costs is not.  (Bus. & Prof. Code, § 17043 ["It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof . . . ."].)  On the other hand, to the extent plaintiffs' allegation was that American was incurring and paying other costs, such as workers' compensation and health and pension benefits, which its underbid did not recover – and thus by implication American was selling its services below cost – the allegation lacks the required specificity.  (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003)

25

114 Cal.App.4th 309, 322 ["To satisfy the requirements of section 17043, a plaintiff must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business."]; *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 275 ["to satisfy the pleading requirements of section 17043, the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing business. [Citation.] And the various costs must be stated in other than conclusionary terms**.**"]

9.      *The Demurrer Was Properly Sustained as to the UCL Cause of Action*

Plaintiffs seek injunctive relief ordering American not to violate the prevailing wage law. Plaintiffs pray for a "A temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants from submitting illegally deflated bids for 'public works' projects based on defendant's lowered labor costs achieved by failing to pay its employees the 'prevailing wage' rate on any and all bids for 'public works' contracts which Plaintiffs also submit bids on." A third party has standing to sue a contractor for declaratory and injunctive relief ordering payment of the prevailing wage. (*Monterey/Santa Cruz County etc, v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1521 ["Local and union contractors had a beneficial interest in the enforcement of the prevailing wage requirement because it was intended to benefit them."]; see also *Vasquez v. State of California* (2008) 45 Cal.4th 243, 248-249, 260 [court awarded private attorney general fees to union official pursuing taxpayer action against the state arising from stipulated injunction to ensure payment of prevailing wage to state prisoners].)

American demurred on the grounds that plaintiffs failed to allege, and cannot allege if permitted leave to amend, that plaintiffs would suffer immediate and *irreparable* harm unless enjoined. Plaintiffs do not address the requirement to show irreparable harm required for injunctive relief. Accordingly, we find no error by the trial court in sustaining American's demurrer to that cause of action.

26

## DISPOSITION

The judgment dismissing plaintiffs' complaint is reversed.  The trial court is directed to enter a new order overruling American's demurrer to plaintiffs' cause of action for intentional interference with prospective economic advantage, and to sustain the demurrers as to the causes of action for predatory pricing under Unfair Practices Act and for an injunction under the Unfair Competition Law.  Plaintiffs shall recover their costs on appeal.


                                              RUBIN, ACTING P. J.

I CONCUR:


           FLIER, J.

27

**B255558**
**Roy Allan Slurry Seal, Inc., et al. v. American Asphalt South, Inc.**
**GRIMES, J.** – Concurring in part and dissenting in part.

I concur with the conclusion the trial court properly sustained the demurrer to the second and third causes of action without leave to amend. I dissent from the conclusion that plaintiffs have alleged a cause of action for intentional interference with prospective economic advantage.

To state a claim for intentional interference with prospective economic advantage, a plaintiff must allege, along with four other elements, "the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff." (*Korea Supply Company v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1164 (*Korea Supply*).) The principal question presented in this appeal is whether the plaintiffs, who are bidders on public contracts, have alleged this threshold element of the tort in their lawsuits against the bidder who won the contracts.

In my view, plaintiffs have not alleged and cannot allege the "existence of an economic relationship" with the public entities that solicited bids for public works contracts. Consequently, plaintiffs cannot satisfy the necessary elements of a cause of action against the winning bidder for interference with prospective economic advantage.

The Supreme Court has enunciated the elements of the tort of intentional interference with prospective economic advantage many times. *Korea Supply* is the Supreme Court's most recent opinion analyzing the tort. The court described the first element of the tort this way: "First, a plaintiff . . . must allege the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff. This tort therefore 'protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise.' [Citation.] . . . Only plaintiffs that can demonstrate an economic relationship with a probable future economic benefit will be able to state a cause of action for this tort." (*Korea Supply, supra,* 29 Cal.4th at p. 1164.)

1

The other four elements are these:  "Second, a defendant must have knowledge of the plaintiff's economic relationship. . . .  [¶]  Third, the defendant must have engaged in intentionally wrongful acts designed to disrupt the plaintiff's relationship.  [T]his requires a plaintiff to plead (1) that the defendant engaged in an independently wrongful act, and (2) that the defendant acted either with the desire to interfere or the knowledge that interference was certain or substantially certain to occur as a result of its action. . . . [¶]  . . .  Fourth, only plaintiffs that can demonstrate actual disruption of their economic relationship will be able to state a claim for this tort. . . .  [¶]  Fifth, a plaintiff must establish proximate causation," showing "that the economic harm it suffered was proximately caused by the acts of the defendant."  (*Korea Supply, supra,* 29 Cal.4th at pp. 1164-1165.)

This case concerns only the first element of the tort:  whether plaintiffs have alleged "an economic relationship with a probable future economic benefit . . . ."  (*Korea Supply, supra,* 29 Cal.4th at p. 1164.)  Otherwise stated, did plaintiffs, as bidders on public works projects, have the requisite "economic relationship with a probable future economic benefit" with the public entities that solicited the bids?

In my view, the question virtually answers itself, and the answer is "no."  Indeed, in the context of public works contracts, it is not possible for such a relationship to exist between the bidder and the public entity soliciting bids because public contract law forbids it.  Even if one could say that the relationship between bidders and the public entity soliciting bids is an "existing economic relationship" (and I think that is not so), certainly that relationship cannot, as a matter of law, "contain[] the *probability* of future economic benefit" to the bidder.  It is antithetical to the principles of competitive bidding on public works projects that any bidder may expect probable future economic benefit – *none* of the bidders has a "probability" of future economic benefit from the contract on which it is bidding.

This is, of course, a case of first impression, in that there is no California authority holding that a bidder on a public works contract cannot allege a claim for interference with prospective economic advantage against the winning bidder.  But the authorities

plaintiffs cite do not support their position, and the authorities that exist, by analogy, support my conclusion that a bidder on a public works project has no economic relationship with the public entity that contains the probability of future benefit.

I begin with *Korea Supply*, the case upon which plaintiffs principally rely. As plaintiffs say, they "put their legal eggs in the *Korea Supply* basket." But *Korea Supply* in no way supports the proposition that a bidder on a public contract has an economic relationship with the entity soliciting bids.

*Korea Supply*, of course, did arise in a bidding context. The plaintiff, however, was *not* a manufacturer of the product that was the object of the bid and did not submit a bid. Plaintiff claimed that the defendant winning bidder (Lockheed Martin) induced the Republic of Korea to award a military equipment contract to it, rather than to a competing bidder (MacDonald Dettwiler), by offering bribes and sexual favors to Korean officials, and the contract was awarded to Lockheed Martin despite MacDonald Dettwiler's significantly lower bid and superior equipment. I repeat, the plaintiff was not, as here, the losing bidder. The plaintiff was the broker for the losing bidder. Plaintiff represented MacDonald Dettwiler in its bid and expected to receive a $30 million commission from MacDonald Dettwiler if the bid were successful.

In short, the plaintiff broker in *Korea Supply* clearly had an "economic relationship with some third party [MacDonald Dettwiler, the losing bidder] that contain[ed] the probability of future economic benefit" to the plaintiff broker. As *Korea Supply* stated: "Here, [the plaintiff broker] had an agency relationship with MacDonald Dettwiler under which [the broker's] commission was fixed at 15 percent of the contract price. As alleged in the complaint, if MacDonald Dettwiler had been awarded the contract, [the broker's] commission would have exceeded $30 million. This business relationship and corresponding expectancy is sufficient to meet this first element." (*Korea Supply,* 29 Cal.4th at p. 1164.)

Nothing in *Korea Supply* suggests in any way, shape or form that a losing bidder could sue a winning bidder for interference with prospective economic advantage merely on the basis of allegations the defendant engaged in wrongful acts to obtain the contract.

3

Nothing in *Korea Supply* in any way dilutes the requirement to allege facts showing the first element of the tort: an economic relationship with a third party that contains the probability of future economic benefit. Such an economic relationship existed between the broker and the losing bidder in *Korea Supply* (to the tune of an expected $30 million), but nothing in *Korea Supply* suggests that in this case such a relationship existed between the losing bidders (plaintiffs) and the public entities who awarded the contracts.

Indeed, the first element of the tort was never at issue in *Korea Supply*, which addressed an entirely different question: whether the *third* element of the tort – intentionally wrongful acts designed to disrupt the plaintiff's existing economic relationship – requires a plaintiff to allege the defendant acted with the specific intent to interfere with the plaintiff's business expectancy. As noted already, *Korea Supply* held the plaintiff need not do so, and that "it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Korea Supply, supra,* 29 Cal.4th at p. 1153.) This patently has nothing to do with the need to plead and prove the plaintiff's business expectancy in the first place.

Likewise, the other case on which plaintiffs rely has nothing to do with whether or not the plaintiff had an existing economic relationship with the probability of future benefit. In *Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, the plaintiff bidder on two contracts sued the bidder who won the contracts, claiming the defendant was not properly licensed to perform some of the work called for by the contracts (which were fully performed). (*Id.* at p. 844 & fn. 2.) The court did not address the first element of the tort, simply holding that the lack of a license when the contracts were awarded "does not amount to actionable unlawful interference with contracts." (*Id.* at p. 846.) The contracts were not public works contracts, and the court observed there was no statutory authority "requiring a *private* entity to accept bids only from duly licensed contractors." (*Ibid*.) *Settimo* also observed that statutory licensing regulations in the Business and Professions Code "neither create[] nor den[y] any civil remedy to bidders who lose projects to unlicensed competitors," and that even though the defendant's conduct "amounted to a misdemeanor and foreclosed any possibility of its

4

suing to enforce an awarded contract," sanctioning such misconduct fell to the Contractors' Licensing Board, and the statutory licensing regulations "do not create any action for civil damages in a competing bidder." (*Settimo, supra,* at p. 846.)

In their briefs and in oral argument, plaintiffs consistently have said their argument rests on *Korea Supply*, which provides no support. This case is the first time a California court has held that a losing bidder may sue a winning bidder for interference with prospective economic advantage merely on the basis of allegations the defendant engaged in wrongful acts to obtain a public works contract. Like every case of first impression, there is no precedent directly on point. But the case law that developed the elements of this tort does not support the majority's theory. I turn now to the other authorities that have some pertinence, and find they lend support to my conclusion that, in the context of public contracting, there can be no economic relationship between a bidder and the public entity seeking bids.

In *Blank v. Kirwan* (1985) 39 Cal.3d 311, the plaintiff and one of the defendants both applied for a poker club license in the City of Bell. The city council approved defendant's application, and denied plaintiff's application. Plaintiff sued, alleging a conspiracy among various private individuals and city officials to legalize and monopolize the operation of poker clubs. The plaintiff alleged that "but for defendants' acts he would have made some undetermined profit operating a poker club in the City of Bell," and argued these allegations stated a cause of action for intentional interference with prospective economic advantage. (*Id.* at pp. 329-330.)

The Supreme Court held the plaintiff's complaint did not state a cause of action "because the first element of the tort is lacking." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 330.) "First, '[the] relationship between [plaintiff] and the City cannot be characterized as an economic relationship. It was [plaintiff's] relationship to a class of as yet unknown [patrons] which was the prospective business relationship.' [Citation.]" (*Ibid.*) Even if the relationship between the plaintiff and the city could be characterized as an economic relationship, the court said, "it would make little difference. The tort has traditionally protected the expectancies involved in ordinary commercial dealings – not

5

the 'expectancies,' whatever they may be, involved in the governmental licensing process." (*Id.* at p. 330.) Further, the city council's discretion to grant or deny a poker club license application was "so broad as to negate the existence of the requisite 'expectancy' as a matter of law. Thus, 'no facts are alleged . . . showing that the plaintiff had any reasonable expectation of economic advantage which would otherwise have accrued to him . . . .' [Citation.]" (*Ibid.*)

Cases in other jurisdictions have held that a bidder on a public contract has no valid business expectancy for purposes of a tortious interference claim.

In *Cedroni Associates, Inc. v. Tomblinson, Harburn Associates, Architects & Planners, Inc.* (2012) 492 Mich. 40 (*Cedroni Associates*), the Michigan Supreme Court, in a summary disposition case, held that the disappointed lowest bidder on a public contract does not have a valid business expectancy for the purpose of sustaining a claim of tortious interference with a business expectancy. (*Id.* at p. 43.) In *Cedroni Associates*, a school district, on the advice of the defendant firm that was assisting the district with the bid selection process, awarded a project to a contractor who submitted the second lowest bid. The lowest bidder sued the defendant for tortious interference with a business expectancy.

The court held the plaintiff had no reasonable expectation of being awarded the contract. (*Cedroni Associates, supra,* 492 Mich. at p. 45.) Under Michigan law, the court explained, the lowest bidder on a public contract cannot bring a cause of action against the municipality when its bid is rejected, even when the municipality is required to accept the lowest responsible bidder. (*Id.* at p. 46.) Given that rule, the court said, "it is difficult to fathom how plaintiff's submission of the lowest bid could have created a valid business expectancy in light of the highly discretionary process of awarding governmental contracts. ***In terms of whether a valid business expectancy is created, a plaintiff's expectations are entirely the same regardless of whether it alleges that the government has wrongfully denied it the contract or, as here, that a third party has interfered and caused a denial of the contract.***" (*Id.* at pp. 46-47, italics and boldface added.) The court further observed that, by statute, the public entity could reject any or

6

all bids, and " 'when the ultimate decision to enter into a business relationship is, by statute, a highly discretionary decision, a plaintiff cannot establish that its "business expectancy" [reflected] a reasonable likelihood or possibility and not merely wishful thinking.' [Citation.]" (*Id.* at p. 47.)

In light of these principles, "a bidder on a school construction project should know that its submission of the lowest bid does not create a reasonable probability that the school district will award it the contract." (*Cedroni Associates, supra,* 492 Mich. at p. 47.)

Other states have reached similar conclusions.

In *Powercorp Alaska, LLC v. Alaska Energy Authority* (Alaska 2012) 290 P.3d 1173 (*Powercorp*), the plaintiff and one of the defendants both developed and manufactured "switchgear" systems used to improve the operation of power-generation facilities, and both companies "have tried to secure and sometimes have secured, contracts with the [public agency] to install switchgear . . . ." (*Id.* at p. 1176.) A key component of these systems was a "controller," and the two companies used different technologies for this key component. (*Ibid*.) The facts of the case are complex and were disputed, but the plaintiff eventually sued the public agency that awarded the contract to its competitor, as well as one of the agency's employees, the competitor, and others. (*Id.* at p. 1180.)

The plaintiff alleged, against the agency's employee, a claim for intentional interference with prospective economic advantage and misappropriation of a trade secret. (*Powercorp, supra,* 290 P.3d at p. 1181.) *Powercorp* upheld the trial court's dismissal of the intentional interference claim, saying this: "[The plaintiff's] intentional interference claim is premised on the notion that [the plaintiff] has an existing prospective business relationship *with* the [agency], but it has not met this threshold requirement. Procurement laws entitle [the plaintiff] to a fair bidding process in which no particular contractor is favored from the outset. Submitting a bid entitles the bidder to 'fair and honest

7

consideration.'  Submitting a bid does not provide any one bidder with a contract expectancy superior to the rights of other bidders."**1**  (*Id.* at pp. 1186-1187, fn. omitted.)

In *Duty Free Americas, Inc. v. The Estée Lauder Companies, Inc.* (S.D. Fla. 2013) 946 F.Supp.2d 1321 (*Duty Free*), the plaintiff was an operator of duty-free stores in airports, and sued one of its former suppliers for intentional interference with the plaintiff's bids to obtain additional airport retail outlets.  The court, applying Florida law, dismissed the complaint because it "fail[ed] to plausibly allege that a business relationship existed between it and the Newark, Boston, and Orlando airports . . . ."  The court dismissed the complaint without prejudice, but observed that "it seems unlikely [the plaintiff] will be able to sufficiently plead the existence of a protected business relationship . . . ."  (*Id.* at p. 1338.)

The court explained that "a bidder generally cannot establish a protected business relationship with an entity soliciting bids through a competitive bidding process," because a solicitation for bids is "merely a request for offers from interested parties," and because "a solicitation for bids encourages parties besides a plaintiff bidder to submit offers in response," so "the bidding process itself cannot serve as evidence that the solicitor probably would have entered into a contract with the plaintiff but for the defendant's interference."  (*Duty Free, supra,* 946 F.Supp.2d at pp. 1338-1339.)  Consequently, "to establish a protected business relationship within a bidding process, a plaintiff must allege additional facts indicating that the relationship went beyond the bidding process and into negotiations which in all probability would have been

---

**1**      The court went on to say that the plaintiff did not submit a bid.  The plaintiff chose not to do so because it understood the request for proposals to require using a key component (the controller) other than its own, and it had no intention of building systems using other controllers, so chose not to bid.  The court then concluded:  "[The plaintiff] has not shown that but for [the employee's] interference, it expected to enter a contract with the [agency] from which it would derive economic benefits."  (*Powercorp, supra,* 290 P.3d at p. 1187.)  This conclusion, it seems to me, refers to the fifth element of the tort, proximate causation (*Korea Supply, supra,* 29 Cal.4th at p. 1165), and in no way undermines *Powercorp*'s previously stated holding that submitting a bid does not provide any bidder with the threshold requirement of "an existing prospective business relationship."  (*Powercorp,* at pp. 1186-1187.)

completed." (*Id.* at p. 1339.) The court went on to describe additional reasons for finding no protectable relationship, including that there was no allegation the airports had to accept the lowest bid for duty-free concessions, but concluded by reiterating that "participating in this competitive bidding process does not establish a protected business relationship." (*Ibid*.)

The majority cites various points to distinguish these cases, and of course there are distinctions. But I do not think those distinctions make a difference, or detract from the fundamental threshold point each case makes. Notably, plaintiffs do not even attempt to distinguish these cases. Instead, plaintiffs merely say, without citation, that "cases . . . referring to 'disappointed bidders' are factually inapposite" because they do not contain allegations of " 'independently wrongful conduct' " by the defendant toward the plaintiffs. This assertion illustrates in sharp relief a fundamental misunderstanding of the elements of an intentional interference claim.

California does indeed require, unlike other jurisdictions, independently wrongful conduct. But, as I noted above, that requirement is part of the *third* necessary element of the tort: intentionally wrongful acts designed to disrupt the plaintiff's relationship. The Supreme Court made plain in *Korea Supply* this requirement is part of the third element of the tort.[2] That has nothing to do with the need to plead and prove the *first* element of the tort: an economic relationship with probable economic benefit that necessarily must pre-exist the defendant's wrongful conduct interfering with it.

That the economic relationship containing the probability of future benefit must precede, or exist separately from, the defendant's interference seems obvious, and is apparent in the cases. In *Korea Supply*, the plaintiff had an agency relationship with a

---

[2] "[Lockheed Martin] contends that to satisfy the tort's third element -- intentional wrongful acts designed to disrupt the plaintiff's relationship with its benefactor -- a plaintiff must allege that the defendant purposely sought the disruption. It asserts that the inclusion of the word 'designed' in the typical formulation of the third element is evidence that a plaintiff is required to plead specific intent. We disagree. . . . [¶] Contrary to Lockheed Martin's assertion, the inclusion of the word 'designed' in the third element of the tort does not necessarily mean that this tort contains a specific intent requirement." (*Korea Supply, supra,* 29 Cal.4th at p. 1155.)

bidder that would have given him a $30 million commission if the bidder had won the contract. (29 Cal.4th at p. 1164.) That economic relationship existed entirely apart from and before the defendant's illegal conduct that disrupted that relationship. The same is true in *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 827, where a real estate broker, in response to a seller's open listing of her property with the intention that responding brokers would be paid a commission, procured a buyer who, with knowledge of the promised commission, induced the seller to make a sale agreement leaving the broker uncompensated. (*Id.* at p. 829.) The broker's "expectancy" existed without regard to the defendant's subsequent conduct.

Again, and always, the plaintiff's "expectancy" must necessarily precede the interfering conduct. *Sole Energy Company v. Petrominerals Corporation* (2005) 128 Cal.App.4th 212, 243, makes this plain. (That case did not involve bidding on a public contract.) In that case, the plaintiffs contended one of the defendants (Silverman) tortiously interfered in a transaction by which one corporation was to acquire the stock and assets of another (HBOC). (*Id.* at pp. 241, 243.) The court found the plaintiffs failed to produce evidence Silverman interfered with an existing economic relationship. Silverman made misrepresentations about another defendant's (Petrominerals) inability to purchase and lack of interest in acquiring HBOC. (*Id.* at pp. 218, 243.) But Silverman's allegedly wrongful conduct occurred *before* the plaintiffs' economic relationship with the third party (HBOC and others) arose: "As of [the date of Silverman's misrepresentations], none of the Plaintiffs in this case had an existing economic relationship with HBOC [and the others], much less an existing relationship containing the *probability* of a future economic benefit. Discussions about the possibility of purchasing HBOC's stock had just begun in earnest. The letter of intent – which Plaintiffs contend was the basis for their interference with economic relationship cause of action – would not be written until three months later." (*Id.* at p. 243.) The court also found the misrepresentations were made to induce the plaintiffs into seeking an economic relationship with HBOC and the others, not to disrupt it. (*Ibid.*)

10

Thus it is plain that the "economic relationship . . . that contains the probability of future economic benefit to the plaintiffs" is a threshold element, and cannot depend for its existence on whether or not defendant acts wrongfully. The threshold question to ask is, did plaintiffs have an existing economic relationship with the public entity soliciting bids for a public project containing the probability of future economic benefit? – without regard to defendant's allegedly illegal conduct. In other words, plaintiffs must have a prospective economic advantage or expectancy with which a defendant might then interfere or disrupt. But no such expectancy exists among bidders for a public works contract.

*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507 put the point very well: "These two decisions, *Blank* [*v. Kirwan, supra*] and *Youst* [*v. Longo* (1987) 43 Cal.3d 64], support the view that the interference tort applies to interference with *existing* noncontractual relations which hold the promise of future economic advantage. In other words, it protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." (*Id.* at p. 524.) *Westside Center* examined many cases in connection with the claim before it, which was that liability could be imposed for interfering with prospective relationships with "as yet unidentified" third parties. (*Id.* at p. 520.) Examining various cases, the court agreed with the view that "a defendant's tortious conduct must have interfered with a specific existing relationship, not simply with the formation of one in the future" (*id.* at p. 525), and found that view gained additional support from the usual formulation of the elements of the tort itself: "These requirements presuppose the relationship existed at the time of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise." (*Id.* at p. 526.)

In short, plaintiffs, and the majority, have conflated two different elements of the tort. Plaintiffs allege an existing relationship arose with the public entity, containing a probability of future economic benefit, solely by virtue of having submitted a bid. And the majority holds that the second lowest bidder, who would otherwise have been

11

awarded the contract, can state a cause of action against the winning bidder if the winning bidder obtained lowest bidder status only by illegally paying its workers less than the prevailing wage. Both these theories effectively rewrite the first element of the cause of action for interference with prospective economic advantage – "an economic relationship with a probable future economic benefit" – by wiping out the predicate "relationship" language.

Under plaintiffs' theory, anyone who submits a bid has a legitimate expectation of winning the contract – an expectation that arose at the moment of submitting a bid, even though it cannot be determined until after all the bids have been unsealed which bidder is the second lowest bidder. And under the majority's theory, the second lowest bidder has that legitimate expectation, if it turns out that the winning bidder engaged in illegal conduct. Both these theories would create a new tort for the benefit of parties who had no relationship with the public entity whatever before submitting a bid. This is a departure without logical reason from all the cases limiting the tort to " 'interference with an existing contract or a contract which is certain to be consummated.' " (*Buckaloo, supra,* 14 Cal.3d at p. 823, fn. 6; see *id.* at pp. 826-827.)

The only reason plaintiffs offer for reinventing the tort of interference with prospective economic advantage was the assertion in oral argument that "the best way to prevent wage theft" is to expand the tort as plaintiffs propose. And the majority likewise maintains that sound policy reasons, and particularly the prevailing wage law, support its conclusion. But the tort of interference with prospective economic advantage was not developed to prevent wage theft; it was developed to protect relationships that give rise to expectancies in commercial dealings, not the "expectancies," whatever they may be, of a bidder for a public contract. (See *Blank v. Kirwan, supra,* 39 Cal.3d at p. 330.)

Moreover, the public works process is not intended to prevent wage theft. It is intended to provide infrastructure and projects for public benefit, at the lowest cost to the public. Public works projects are intended to benefit the public, not bidders. (*Swinerton & Walberg Co. v. City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, 101 [lowest bidder on public works contract has no tort cause of action

12

against public entity for awarding contract to second lowest bidder because competitive bidding requirements were imposed solely for the benefit and protection of the public rather than for the benefit of the bidders]; *Charles L. Harney, Inc. v. Durkee* (1951) 107 Cal.App.2d 570, 580 ["competitive bidding statutes are not passed for the benefit of bidders but for the benefit and protection of the public"]; see *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 308, 317 (*Kajima*) [low bidder may recover bid preparation costs from public agency for wrongful denial of contract under promissory estoppel theory, but not lost profits; "competitive bidding statutes are ' "enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders" ' "; allowing award of lost profits would not benefit the general public].)

Although the majority says this expansion of the tort will permit the second lowest bidder to sue the winning bidder who won the award by engaging in illegal conduct, there is no reason why the newly expanded tort will not provide a cause of action to *every* bidder that alleges all the lower bidders engaged in wage theft, or predatory pricing, or bribery, or provided sexual or other favors, or engaged in any other kind of illegal conduct. Imposing a duty upon each bidder owed to competing bidders giving rise to an actionable claim of interference with prospective economic advantage would disrupt, increase the cost, and delay the completion of public works. (See generally *Kajima, supra*, 23 Cal.4th at p. 317 [the possibility of recovering lost profits against public agency alone may encourage frivolous litigation and further expend public resources; "prudence is warranted whenever courts fashion damages remedies in an area of law governed by an extensive statutory scheme"].)

For these reasons, I cannot agree with the majority that plaintiffs have stated a claim for intentional interference with prospective economic advantage. I would affirm the trial court's judgment.


GRIMES, J.


13